**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

07 CV 5607

Index No. JUDGE CONNER

Rhonda Garner d/b/a Decor Specialties,
on behalf of herself and all others similarly
situated,

                                        Plaintiffs,

        - against -

MBF Leasing, LLC, Lina Kravic, Brian
Fitzgerald, Sam Buono, and  William Healey,

_____
                        Defendants

Class Action Complaint
Jury Trial Demanded

## Nature of Action

1.      In this class action, Ms. Garner, a small business owner from
California, asserts that Defendants conducted a fraudulent scheme to obtain signatures
of small businessmen on what appear to be standard form one-page leases ("Lease").
Thereafter, Defendants (through the corporate Defendant) routinely collect through
automatic electronic deductions much more than what is specified in the Lease, and
foist several other liabilities on the unsuspecting small businesses.  Such illicit
deductions also include a routine $4.95 every month towards what is in substance
equipment insurance.  This collection is in direct violation of state laws regulating
insurance.

2.      When small business owners (class members) raise questions,
Defendants finally reveal the existence of 3 additional pages following the signature
page, which 3 pages make the Lease irrevocable, onerous, and virtually indefinite.
Routinely, these pages and their contents are never disclosed to the small business
owners at the inception, and are not incorporated into the Lease.  Nevertheless,
Defendants saddle small business owners with all these terms and enforce them

1

strictly, filing thousands of collection suits in the New York City Civil Court in Manhattan, and obtaining default judgments against small business owners residing all over the United States.[1]

3.    Moreover, when small business owners challenge the validity of the Lease and stop Defendants' automatic deductions from such businesses' accounts due to fraudulent inducement, or other valid reasons, Defendants promptly and routinely make inaccurate and false adverse entries in their personal credit reports. These reports are made unlawfully, maliciously and with willful intent to injure class members in order to intimidate them into paying unwarranted sums to Defendants. Accordingly, when notified of a dispute by the credit reporting agencies, Defendants refuse to investigate and/or to rectify the inaccurate reports.

4.    On these and related grounds, Ms. Garner asserts class claims against Defendants pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA"), New York Insurance Law §§ 1102 and 2102, as well the common law for fraud, conspiracy, concerted action, breach of contract, unjust enrichment, and money had and received. For herself and the class, Ms. Garner seeks compensatory, statutory, punitive and/or exemplary damages together with equitable and injunctive relief as well as attorneys' fees and expenses.

**Parties**

---

[1] The contract and the fraudulent scheme at issue here mirror those employed by Northern Leasing Systems, Inc., and are the subject matter of a class action lawsuit in New York Supreme Court, wherein the Appellate Division, First Department, has upheld claims for fraud, breach of contract, unjust enrichment, money had and received, and for punitive damages on the fraud and contract claims. Pludeman v. Northern Leasing Sytems, Inc., 2007 WL 1412500 (1st Dep't May 15, 2007).

5.    Plaintiff Rhonda Garner is a resident of Big Bear City, California, doing business under the name and style of Décor Specialties.

6.    Defendant MBF Leasing LLC ("MBF") is a New York limited liability company with its principal offices in Manhattan. Upon information and belief, MBF is a micro-ticket leasing company affiliated with Northern Leasing Systems, Inc. MBF claims to be an equipment finance lessor specialising in the lease financing of electronic point of sale equipment.

7.    The individual Defendants comprise the senior management of MBF, and are the masterminds behind the fraudulent scheme at issue. Defendant Healey is the President of MBF, and as such, responsible for the operations and conduct of the entire organization. Defendant Buono is the Vice President of MBF. Defendant Kravic is the Operations Manager of MBF, who is primarily responsible for MBF's originations and operations. Defendant Fitzgerald is the Executive Vice President of MBF's business development.

## Jurisdiction & Venue

8.    Subject-matter jurisdiction exists pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims arise, inter alia, under federal laws and statutes including without limitation, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq.

9.    Jurisdiction also exists pursuant to the general diversity statute, 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"). Diversity exists between the parties to this class action and the amount-in-controversy is at least $5,000,000 in aggregate damages on behalf of the Class, exclusive of interest and costs. Plaintiff Garner is a citizen of California.

3

Defendant MBF is a citizen of New York.

10.    This Court has pendent, supplemental or ancillary subject-matter jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367(a) insofar as those claims arise from a common nucleus of fact concerning the same course of conduct between the same parties.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside and/or do business in this Judicial District and a substantial portion of the activities giving rise to Plaintiffs' claims took place in this Judicial District.

### Class Action Allegations

12.    Plaintiff brings this action pursuant to Rule 23, Fed. R. Civ. P., on behalf of a Class consisting of herself and all other persons in the United States who are lessees or guarantors under leasing or financing contracts with the Defendant MBF whereunder MBF (as lessor, or as assignee of the lessor) purported to Lease business equipment, and/or persons in whose credit reports Defendants made inaccurate/incomplete credit entries.  The Class excludes Defendants, or any parent, subsidiary, affiliate, accountant, agent, attorney, employee, officer, representative, servant, and/or any person acting on behalf of Defendants or any of them.

13.    MBF does business throughout the United States, and enters into the Lease by itself directly as well as through third party vendors.  Thus, it is clear that tens of thousands of persons have signed the Lease with MBF and continue to do so. Clearly, the Class is so numerous that joinder of all of the members is impracticable.

14.    Plaintiff's claims are typical of the claims asserted on behalf of the Class.

4

15.    Plaintiff does not have any interests that are adverse or antagonistic to those of the Class.

16.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

17.    Upon information and belief, MBF's leasing and financing contracts involve financing of items that sell for under $10,000. Thus, individual compensatory damages of most Class members are likely to be relatively small and hence, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the Class would prosecute individual actions. And if they did, such individual prosecution would be impracticable as well as inefficient.

18.    Plaintiff is not aware of any pending litigation concerning the claims herein.

19.    This Court is the most appropriate forum for adjudicating the claims at issue, which arise under federal statutes and common law. The Lease contains a New York choice of law provision, and further, designates New York as a forum State (although MBF or its successor-in-title has the unilateral prerogative to change that). MBF is a New York corporation. The principal offices of all Defendants are in this judicial district.

20.    Plaintiff does not anticipate any difficulty in the management of this action as a Class action.

21.    There are many questions of law and fact common to the Class which predominate over any questions which may affect individual members. The

predominant common questions of law and fact include, among others:

    a.      Whether Defendants are liable for Fraud?

    b.      Whether Defendants are liable for violation of FCRA?

    c.      Whether Defendants are liable for violation of New York's Insurance Law?

    d.      Whether MBF is liable for Breach of Contract?

    e.      Whether MBF is liable for Unjust Enrichment?

    f.      Whether MBF is liable for Money Had and Received?

    g.      Whether Plaintiff is entitled to equitable and injunctive relief against Defendants;

    h.      Whether Plaintiff is entitled to compensatory damages, and if so the measure of such damages; and

    i.      whether Plaintiff is entitled to punitive damages, and if so, the measure of such damages.

    22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

### Factual Allegations

    23.    Defendants claim to be in the business of financing equipment for small businesses through so-called "equipment finance lease" contracts, the Lease. Typically, these transactions involve small equipment such as point-of-sale credit card swiping machines.

    24.    Defendants designed and perpetrated, and continue to perpetrate, a fraudulent scheme to defraud small business owners (Class members) by willfully concealing, and/or orchestrating the concealment of material facts, and by charging and

6

collecting significantly higher amounts than those represented to Class members.

25.    Defendants, through their own representatives or allegedly independent "vendors", approach Class members, ostensibly offering credit card processing arrangements.  These representatives or allegedly independent "vendors" obtain Class members' signatures on the Lease which has been drafted and prepared by Defendants.

26.    To facilitate this fraudulent scheme, Defendants drafted the Lease such that Class members have to sign on the very first page of the Lease And Personal Guaranty.  Since the signature of parties to a document is always at the end of the document, Class members are led to believe that the Lease is a one page document containing all terms of the Lease.

27.    Moreover, the first page of Defendants's Lease appears to be a complete document.  It contains all the material information usually expected in a small business transaction (name, address, bank preauthorization, amount, equipment information, term, bank information) and signature blocks for both parties.

28.    The first page of Defendants's Lease contains nothing incorporating the remaining three pages, or even alerting Class members to the existence of additional pages that may be part of the Lease terms.  It says expressly:

> Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease.

This statement appears in a box under the caption "Lease Acceptance", which box also contains the space for Class members' signature.

29.    That "Lease Acceptance" box is followed by two other boxes in the

7

same page.  One provides for Class members' personal guaranty, and the other is for signature of acceptance by Defendants.

30.    Thus, the first page effectively conveys that the Lease is a one-page document.  Class members are routinely led to believe, and do believe, that the Lease comprised of just that one page.

31.    A fineprint – indeed, microprint – at the bottom of that page, tucked away in the far left corner of the page reads "page 1 of 4".  Obviously, the placement and size of the print, which is difficult to read even if noticed, does nothing to enable Class members detect or inquire about additional terms.  This is obviously a part of Defendants's fraudulent scheme: when Class members complained about not ever having been aware of the existence of the additional three pages, Defendants routinely relied on this microprint, flatly disclaimed their agent's misrepresentations, and self-righteously blamed Class members for allegedly not having read the microprint.

32.    Consistent with this fraudulent scheme, Defendants' representatives or salesmen selling Defendants' Lease never discuss, mention, or even refer to the remaining three pages.  No copy of the Lease is ever left with class members at the time of signing; instead, they are simply told that a copy will be mailed to them.

33.    Defendants are also aware (at the very least) that their representatives and salesmen routinely do not give a copy of the Lease to Class members.  In fact, Defendants have a special hotline for class members requesting copies of the Lease.  Thus, Defendants are well aware of the  routine concealment of 3 of the 4 pages of the Lease And Personal Guaranty.

34.    Thus, the first page of the Lease is the only one routinely seen by Class members.  As the Appellate Division held while reviewing the substantially similar standard-form contract under the name of Northern Leasing,

> The alleged concealment finds support in the first page of the lease, which contains all of the elements that would appear to form a binding contract, including the signature line, a personal guaranty, and forum selection, jury waiver and merger clauses, with the only references to the additional pages of the Lease being in very small print (*see Broder v. MBNA Corp.*, 281 A.D.2d 369, 370 [2001] ). Further tending to show an intentional and deceptive concealment are allegations that defendants did not provide plaintiffs with fully executed copies of the leases and overcharged them by deducting amounts from their bank accounts greater than those called for by the leases.

*Pludeman*, 2007 WL 1412500, at *1.

35.    Accordingly, the terms contained in the remaining 3 pages cannot be said to have been agreed to by the Class members.  They are not incorporated into the Lease and Personal Guaranty, they appear after the signatures of Class members, and hence, may not be enforced against them under New York law.

36.    Defendants' representatives and salesmen fraudulently sell Class members the Lease for extortionately overpriced items at extremely onerous terms. These items are typically available in the market for outright purchase, free and clear, at a small fraction of the price of Defendants' "lease" prices.[2]  Worse, Defendants routinely

---

[2]The Attorney General of Missouri recently commenced a lawsuit against MBF affiliate Northern Leasing, wherein he asserted that Lease contracts signed by Missouri businesses were altered - as occurred here in California with Ms. Garner - in order to obligate them to four-year leases that could not be canceled and to pay as much as $4,000 for a machine worth about $300.  Missouri Attorney General's News Release, "Firm that leases credit card machines defrauded small businesses in Missouri of

deduct significantly higher amounts than those specified in the first page.  When

challenged, they refer class members to provisions in the hitherto undisclosed 3 pages.

37.    By routinely concealing the additional pages of the Lease and

Personal Guaranty, Defendants have been wilfully causing, enabling, permitting, and

encouraging their representatives/salesmen to misrepresent the terms and effects of

the lease, and the obligations being personally guaranteed by the Class members.

Such representatives/salesmen routinely give an innocuous picture of the Lease,

pointing to the only page disclosed to the Class member and not saying one word about

the grossly inequitable and oppressive terms contained in the remainder of the pages.

Defendants routinely disclaim all such representations made at Lease inception, and

point to the merger clause; this enables Defendants' representatives and salesmen to

make misrepresentations with abandon – anything to clinch the sale.

38.    Defendants and their salesmen fail to disclose to Class members

the harsh terms of the transaction contained in the 3 undisclosed pages.  Thus,

Defendants conceal from Class members:

a.    That according to Defendants, the Lease entitled MBF to charge sums

which were significantly higher than those specified in the first page;

b.    That the automatic electronic deductions from Class members' bank

accounts, and Class members' other Lease obligations, would continue

indefinitely unless Class members gave a specific advance 30-day notice

of cancellation, with a buyout balloon payment, at the end of the specified

_____

thousands of dollars, Nixon says," Apr. 9, 2007
(http://www.ago.mo.gov/newsreleases/2007/040907b.htm)

term;

c.    That the Lease purports to immunize MBF from any warranties for the equipment;

d.    That although  MBF retained title to the equipment leased, it was not answerable for any failure or malfunction of the equipment;

e.    That the Class member's obligation to pay MBF was absolute, non-cancellable and based solely on acceptance of the item leased;

f.    That the Class member had insurance obligations to MBF with respect to the equipment leased;

g.    That in case of an alleged default, MBF could "without demand or legal process enter into the premises where the equipment may be found and take possession of and remove the equipment without liability for such retaking;"

h.    That the charges for late payment of monthly dues were an extortionate 15%, with a minimum of five dollars;

i.    That in case of litigation, Class members were obligated to pay MBF's attorneys' fees and expenses but MBF had no such obligation even if the Class member prevailed;

j.    That any litigation would be in a forum far away from Class members' homes and which forum was chosen and could be changed by MBF or its successor-in-title to the Lease and Personal Guaranty; and

k.    That MBF  - but not Class members - could effect service of process for a legal proceeding by certified mail, return receipt requested.

11

39.    Moreover, in the event of default, Defendants routinely proceed against the guarantor personally.

40.    Worse, Defendants promptly make inaccurate and adverse credit entries in the guarantor's personal credit report even before they commence legal proceedings against the primary obligor, the lessee business, or establish the validity of the Lease against a fraud claim.

41.    Defendants' approach to collection is aggressive.  They use the undisclosed provisions described above to the fullest extent possible to obtain payment from Class members, including sending them phony "summons" and complaints, dunning them with collection letters, and obtaining default judgments against those who refuse to pay.

42.    Defendants' representatives uniformly intimidate Class members with endless phone calls, and expressly telling them that it would be more expensive for such Class members to litigate Defendants's claims in New York than it would be to pay off Defendants.

43.    When Defendants commence legal proceedings, Class members rarely have the opportunity to raise any defenses.  Defendants have hitherto been regularly filing their collection suits in New York, despite the fact that most of the Class members reside in far away states.  Few if any can afford the expense of litigation in a distant forum, and obviously, most cases would end in default judgments.  Thus, Class members have no real opportunity to raise defenses to the lawsuit.

44.    Even Class members who do obtain counsel are hampered by the misleading Lease.  Courts typically take individual contracts at face value unless there

12

is evidence that the Lease is part of pattern and practice of fraud and deception. Given the amounts and controversy, typically under $5,000, it would be extremely difficult for consumer protection lawyers to develop the requisite evidence. Finally, the potential witnesses for Class members are likely to be in his/her local area, and quite far from the New York court.[3]

45.    Obviously, once a judgment is entered in the New York courts, it is almost impossible for Class members to challenge Defendants in the subsequent judgment enforcement actions. Had Defendants filed the suits in the Class members' home location to enforce their claims, they might have been able to defend it properly and prevail on counterclaims for fraud.

46.    Defendants add to the injury by imposing outrageous fees for late payments, as well as for attorney's fees and expenses. Obviously, these fees provide significant profits to Defendants. In many cases, by the time Defendants commence collection, these charges substantially increase the total payments due.

47.    Defendants are totally unconcerned and unresponsive to class members' complaints concerning fraudulent misrepresentations of their representatives or salesmen, undisclosed terms of the Lease, nonfunctioning equipment, or anything else. Instead, they rely heavily on the wording of the undisclosed 3 pages of the Lease to slam complaining Class members that no defense exists to Defendants' demand for

---

[3]Defendants' misuse of New York courts with hundreds of such lawsuits based on fraudulent documents was the subject of an ABC news broadcast recently. http://abclocal.go.com/wabc/story?section=news&id=4870939 ("Is a corporation scamming small businesses?"), which was broadcast on New York channel 7 on May 17, 2007.

payment.

48.    Furthermore, Defendants routinely harass their class members by wilfully making inaccurate reports to credit reporting agencies in order to damage Class members' personal credit ratings.  Defendants' malice and willful intent to injure is clear from Defendants' pattern and/or practice of furnishing such adverse information against the *personal* credit report of individual guarantors, i.e. business proprietors or sole owners, immediately upon alleged default of the lessee, despite serious issues about fraud, misrepresentations and other legal misconduct voiding the Lease and personal guaranty.

49.    When credit reporting agencies notify Defendants of a dispute raised by class members, Defendants routinely and wilfully fail to investigate and/or correct the inaccurate information they provided to the agency.  This drastically affects class members' individual credit scores with serious adverse financial consequences.

50.    Defendants also routinely and improperly access the credit reports of individual Class members without authorization.  Such illicit access also affects class members' credit scores adversely.

51.    Defendants also routinely charge an insurance premium - labeled "loss & damage waiver" ("LDW") - of $4.95 per month per equipment leased.  This premium is never disclosed to class members at the inception, but simply clandestinely added to the monthly amounts automatically deducted by Defendants.  Moreover, such premium is being collected without license or authorization required under state law, and in violation of the insurance laws of various states and New York.

**Plaintiff's Transactions**

14

52.    On or about January 5, 2005, Ms. Garner and her business were approached by Defendants' agent. Relying on that agent's misrepresentations,[4] she signed the Lease.

53.    The Lease did not reveal the insurance premium of $4.95, and Ms. Garner and her business were unaware of this premium. Nevertheless, Defendants collected this premium through automatic deductions from her business account with the bank. Thus, instead of the $69.99 reflected in the first page of the Lease, Defendants deducted $80.36 from her business account every month.

54.    Further, the information under "Schedule of Payments" and "Equipment information" was blank when Ms. Garner signed the Lease. It was filled in later by Defendants or their agents, reflecting an alleged agreement for $69.99 a month for 4 years. In fact, Ms. Garner had put her store up for sale at that time, and already owned the equipment she had; obviously, she would never have agreed to the 4 year Lease.

55.    The equipment under the Lease was dysfunctional, and Ms. Garner attempted to cancel the transaction without any penalty as had been promised by Defendants' agent. She was eventually given MBF's telephone number. When she called MBF seeking instructions about return of the machine, MBF curtly informed her

---

[4]In addition to the concealment of the insurance premium of $4.95, these misrepresentations were (a) that Ms. Garner would pay rates lesser than what she was paying then; (b) the machine leased was a state of the art, reliable, and new equipment which would perform much better than her existing machine; (c) if the machine performance was unsatisfactory, Ms. Garner could simply return the machine with no penalties. Each of these representations was false. The rates were higher, and the machine was unreliable and caused her to manually input the credit card information which led to customer delays and higher rates from the bank.

15

that she would have to continue paying the monthly amount for 4 whole years whether the machine functioned or not.

56.   Ms. Garner arranged with her bank to stop the automatic deductions whereupon MBF promptly commenced its usual dunning calls and collection letters, and wilfully made an inaccurate adverse entry in Ms. Garner's personal credit report. Ms. Garner disputed the entry, but Defendants never rectified the inaccurate entry. Instead, Defendants wilfully attempted to intimidate her into paying over $3,600 for equipment that she didn't need, want, or desire, and which was totally worthless to her.

57.   As a result, Garner suffered damages for which Defendants are liable.

## COUNT I

(Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)

58.   Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

59.   Defendants violated the Fair Credit Reporting Act. As furnishers of information, Defendants provided inaccurate and incomplete information to credit reporting agencies against Ms. Garner and class members who guaranteed its Leases.

60.   Upon receipt of notices of dispute from credit reporting agencies, Defendants wilfully and routinely, and/or in reckless disregard of their statutory and civil obligations, failed to conduct an investigation and/or to correct inaccurate or incomplete information provided to the credit reporting agency.

61.   Ms. Garner and members of the Class were injured thereby.

16

62.    Accordingly, Ms. Garner and the Class are entitled to compensatory or statutory damages in addition to punitive damages and attorneys' fees and costs.

## COUNT II

(Violation of New York Insurance Law §§ 1102, 2102

63.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

64.    Defendants collected, and continue to collect, $4.95 per equipment per month from each class member towards LDW.  Such charge is a premium for obtaining insurance on the leased property.   The LDW constitutes insurance under New York Insurance Law.  New York Ins. Law § 1101.

65.    Defendants are not authorized or licensed to engage in the insurance business in New York or any other state.  Defendants' collection of this insurance premium is without a license or authorization as required by New York Insurance Law, and clearly illegal, N.Y. Ins. Law §§ 1102, 2102.

66.    Defendants' collections are thus, illegal, and Ms. Garner and members of the Class have been injured as a result of Defendants' unlawful conduct.

67.    Accordingly, Ms. Garner and the Class are entitled to disgorgement/restitution, damages and/or equitable relief as permitted under state law.

## COUNT III

(Breach of Contract against MBF)

68.    Ms. Garner repeats and realleges each and every allegation set

17

forth in all of the foregoing paragraphs as if fully set forth herein.

69.     By charging and collecting sums in excess of those specified in the first page of the Lease, and by imposing undisclosed amounts towards alleged taxes and insurance coverage, MBF breached the contracts at issue. As a result of such breach, Plaintiffs and the putative Class sustained damages.

70.     Moreover, Defendants' fraudulent motive and tortious conduct was aimed at the public generally. Their wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable. Defendant MBF is therefore liable to pay punitive damages to Ms. Garner and the Class. In <u>Pludeman</u>, the Court expressly upheld a claim for punitive damages based on substantially similar conduct.

71.     MBF is therefore liable to pay Class Plaintiffs and other Class members compensatory damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate. In addition, Class Plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

### COUNT IV

### (Fraud)

72.     Ms. Garner repeats and reallege each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

73.     Defendants conducted a fraudulent scheme to entrap Class members into highly overpriced leases with extremely onerous terms. They also wilfully and knowingly concealed material facts from Class Plaintiffs and other Class members,

18

and routinely failed to give them a copy of the Lease or even reveal the existence of more than the first page of the Lease.  Defendants also knew the material nature of the facts that they willfully concealed from Class members, and that Defendants ought to have disclosed these facts at that time to the Class members.  Defendants had superior knowledge not available to Class Plaintiffs and other Class members; as such, they had the duty to disclose the facts.  Class Plaintiffs and other Class members relied upon Defendants' representations, and were unaware of the falsity or misleading nature of the representations.  Class Plaintiffs and other Class members' reliance was reasonable under the circumstances.  As a result of such reliance, Class Plaintiffs and other Class members sustained damages.

74.    By engaging in the conduct described above, Defendants committed a fraud upon Class Plaintiffs and other Class members.

75.    Moreover, Defendants' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.  Defendants are therefore liable to pay punitive damages to Ms. Garner and the Class.  In Pludeman, the Court expressly upheld a claim for punitive damages based on substantially similar conduct.

76.    Defendants are therefore liable to pay Ms. Garner and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.  In addition, Ms. Garner and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

19

## Count V

### (Concerted Action)

77.    Ms. Garner reiterates the contents of the paragraphs hereinabove.

78.    Defendants had an agreement or understanding between themselves, whether express or tacit, to participate in a common plan or design to commit the aforesaid tortious acts.  Each person acted tortiously, and committed a tort in pursuance of the said agreement or understanding.  Accordingly, the actions of each person are attributable to every other person and MBF.

79.    Defendants are therefore liable to pay the class damages in such amount as may be appropriate after discovery and trial.

## Count VI

### (Civil Conspiracy)

80.    Ms. Garner reiterates the contents of the paragraphs hereinabove.

81.    Defendants conspired with the other(s) to participate in a common plan or design to commit the aforesaid tortious acts.  Each of them acted tortiously, and one or more of the said persons committed tort(s) in pursuance of the agreement or understanding.  Accordingly, the actions of each person are attributable to every other person and MBF.

82.    Defendants are therefore liable for civil conspiracy to pay the class damages in such amount as may be appropriate after discovery and trial.

20

## COUNT VII

### (Money Had and Received)

83.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

84.    By the aforesaid unlawful acts, MBF unlawfully billed and collected money that it was not entitled to.  It received money belonging to Ms. Garner and Class members.  MBF benefitted from the receipt of money, and under principles of equity and good conscience, it should not be permitted to keep the money.

85.    MBF must not be permitted to take advantage of its own wrong and retain, collect, or continue collecting such money.

86.    MBF is liable to pay Class Plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## COUNT VIII

### (Unjust Enrichment)

87.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

88.    By collecting the excessive charges aforesaid, MBF profited at the expense of Ms. Garner and other Class members.  Equity and good conscience require that MBF be ordered to repay these sums to Ms. Garner and other Class members towards restitution.

89.    MBF must not be permitted to take advantage of its own wrong and

retain, collect, or continue collecting these illegal charges hereon.

90.    Moreover, MBF is liable to pay Class Plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## JURY TRIAL DEMAND

58.    Ms. Garner and the Class demand a jury trial on all issues so triable.

WHEREFORE, Ms. Garner and class members demand judgment against Defendants, jointly and severally,

a.    determining that the instant action be maintained as a Class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    declaring that every Lease and financing agreement under MBF's standard form Lease is void and/or voidable at the option of the individual lessees/guarantors thereof (Class members herein) for fraud in the inducement;

c.    declaring that pages 2-4 of all leases under MBF's standard form Lease are unenforceable against Ms. Garner and the Class members;

d.    ordering Defendants to refund to Ms. Garner and to individual Class members all sums collected in excess of the amount specified in the first page of the Lease;

e.    ordering Defendants to refund to individual Class members all sums collected on account of any judgment obtained by Defendants in a New York court (or in a court other than that of the individual Class members'

place of residence), based upon alleged breaches of the Lease by such individual Class members, and forthwith enter a satisfaction of all such judgments in the court wherein they were entered;

f.    awarding compensatory, and/or punitive damages to Ms. Garner and Class members in such amount, not less than $100 million, as may be determined after discovery and trial;

g.    awarding Ms. Garner and Class members the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements; and

h.    for such further and other relief as may be just and proper.

Dated:    New York, New York          **Chittur & Associates, P.C.**
          June 12, 2007

By: Krishnan Chittur, Esq. (KC9258)
286 Madison Avenue Suite 1100
New York, New York 10017
Tel: (212) 370-0447
Email: kchittur@chittur.com

And

Seth R. Lesser, Esq.
Locks Law Firm
110 East 55th Street
New York, New York 10022
Tel: (212) 838-3333
Attorneys for Plaintiff and the Class

Of counsel:
Rajan Sharma, Esq.

23