UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                   :

RHONDA GARNER D/B/A DÉCOR         :     07 CV 5607 (WCC) (MDF)
SPECIALTIES, ON BEHALF OF HERSELF AND  :
ALL OTHERS SIMILARLY SITUATED,       :

                                :     **NOTICE OF DEFENDANTS'**
             Plaintiffs,        :     **MOTION TO DISMISS**

         -v-                   :

MBF LEASING, LLC, LINA KRAVIC, BRIAN    :
FITZGERALD, SAM BUONO, AND WILLIAM  :
HEALY,                            :

            Defendants.      :

———————————————————————— x

PLEASE TAKE NOTICE, that upon the annexed Declaration of Jayson Glassman, Esq.,

sworn to on October 5, 2007, and the annexed Declaration of Brian Fitzgerald, sworn to on

October 4, 2007, together with the corresponding exhibits annexed thereto, and the

accompanying memorandum of law, and upon all of the pleadings herein, defendants MBF

Leasing, LLC, Lina Kravic, Brian Fitzgerald, and Sam Buono, by their counsel, Moses & Singer

LLP, will move this Court before the Honorable William C. Conner, at the United States

Courthouse 300 Quarropas Street, Room 630, White Plains, NY 10601 on November 27, 2007,

or as soon thereafter as counsel may be heard, for an order pursuant to Rule 12(b)(2) & 12(b)(6)

of the Federal Rules of Civil Procedure dismissing the Complaint, dated June 12, 2007, of

plaintiff Rhonda Garner d/b/a Décor Specialties, on behalf of herself and all others similarly

situated, and for such further relief as this Court deems just and proper.

Dated:  October 5, 2007
       New York, New York

MOSES & SINGER LLP
Attorneys for Defendants

By:    /s/ Abraham Y. Skoff    
       Abraham Skoff (AS-5330)
       Jayson Glassman (JG-4773)


The Chrysler Building
405 Lexington Avenue
New York, New York  10174
Tel. 212-554-7800
Fax 212-554-7700
askoff@mosessinger.com
jglassman@mosessinger.com

**TO**:

CHITTUR & ASSOCIATES, P.C.
286 Madison Avenue Suite 1100
New York, New York 10017

- and -

LOCKS LAW FIRM, PLLC
Seth R. Lesser, Esq.
110 East 55th Street
12th Floor
New York, New York 10022

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                :
RHONDA GARNER D/B/A DÉCOR           :        07 CV 5607 (WCC) (MDF)
SPECIALTIES, ON BEHALF OF HERSELF AND  :
ALL OTHERS SIMILARLY SITUATED,        :
                                :
               Plaintiffs,       :
                                :
       - against -             :
                                :
MBF LEASING, LLC, LINA KRAVIC, BRIAN    :
FITZGERALD, SAM BUONO, AND WILLIAM   :
HEALY,                            :
                                :
             Defendants.    :
                                :
———————————————————————— x

### DECLARATION OF JAYSON GLASSMAN IN SUPPORT
### OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

I, JAYSON GLASSMAN, declare the following to be true:

1.      I am an attorney with the firm of Moses & Singer, LLC, attorneys of record

for the Defendants in this action. I am a member of the bar of this Court.

I make this declaration in support of Defendants' motion to dismiss the complaint.

2.      Attached as Exhibit A is a true and correct copy of the equipment finance

lease agreement between defendant MBF Leasing, LLC ("MBF") and plaintiff, Rhonda

Garner d/b/a Décor Specialties (the "Lease"). The Plaintiff's social security number has

been redacted.

3.      Attached as Exhibit B is a document entitled "Universal Merchant Services,

Business License and Voided Check Form", which contains a copy of Décor Specialties'

business license, and a Décor Specialties voided check. The account number has been

redacted.

634081

4.    Attached as Exhibit C is a true and correct copy of the Complaint, dated June 12, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this Declaration was executed by me on the 5th day of October, 2007.

_____
JAYSON GLASSMAN

# Merchant
## Services
16W281 West 83rd Street, Burr Ridge, IL 60527 • 888-275-3251

Lease Number: 0445316

Salesman Code: MUNW

# EQUIPMENT FINANCE LEASE

## ABOUT YOUR BUSINESS

Lessee (Corporate Business Name): DECOR SPECIALTIES    D/B/A

Billing Address: PO BOX 1613

City: BIG BEAR LAKE    State: CA    Zip Code: 92315    Telephone: (909) 866-8545

Type of Business: Gift Store    E-Mail Address:    Yrs. in Business: 22

Business Address (if different from above): 40716 BIG BEAR BLVD.

City: BIG BEAR LAKE    State: CA    County: San Bernadino    Zip Code: 92315    Business Telephone: (909) 866-8545

Name of Principal: Rhonda Garner    Title: Pres.

Home Address: PO BOX 453    City: BIG BEAR LAKE    State: CA    Zip Code: 92314    Telephone: (909) 866-8545

## EQUIPMENT SUPPLIER

Supplier's Name: UMS

Address: 9012 Research Dr. #200    City: Irvine    State: CA    Zip Code: 92618    Telephone: 949 261-4000

## EQUIPMENT INFORMATION

Description (Manufacturer, Model, Serial Number):
Lipman   N2685   001453533
Veripone  Pinpad 1000   021-3010-138

Quantity: 1 / 1

Equipment Location:

## SCHEDULE OF PAYMENTS

Basic Monthly Lease Payment: $ 69.99

Minimum Lease Term: 48 Months

Plus Applicable Taxes

## PAYABLE AT SIGNING OF THE LEASE

☐ First & Last Monthly Payment    $

☑ Last Monthly Payment    $ 69.99

Plus Applicable Taxes

## ABOUT YOUR BANK

Bank Name: FIRST MOUNTAIN BANK    Routing: 122238721    Account #: 001-005944

Lessee hereby authorizes MBF Leasing LLC, or its designee successor or assign (hereinafter "Lessor") to withdraw any amounts including any and all sales and property taxes now due or hereinafter imposed owed by Lessee under this Equipment Finance Lease ("Lease") by initialing debit entries to Lessee's account at the financial institution (hereinafter "Bank") indicated above or at such other Bank as Lessee may from time to time use. In the event of default of Lessee's obligation hereunder, Lessee authorizes debit of Lessee's account or credit card for the full amount due under this Lease or any portion thereof. Further, Lessee authorizes Bank to accept and to charge any debit entries initiated by Lessor to Lessee's account. In the event that Lessor withdraws erroneously from Lessee's account, Lessee authorizes Lessor to credit Lessee's account for the amount erroneously withdrawn. Lessee understands that the foregoing ACH authorization is a fundamental condition to induce Lessor to accept this Lease. Consequently, such authorization is intended to be irrevocable. In the event the Lessee terminates such ACH authorization, Lessor, in its sole discretion, may either deem such termination to be an event of default in accordance with paragraph 11 hereof or may invoice Lessee for payments due under this Lease and include a $5.00 per month processing fee in such invoices. THE TERMS OF THIS LEASE REPRESENT THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN LESSOR AND LESSEE AND MAY NOT BE WAIVED ALTERED MODIFIED REVOKED OR RESCINDED AND ALL PRIOR AND/OR CONTEMPORANEOUS ORAL AND WRITTEN REPRESENTATIONS ARE MERGED HEREIN. ANY AGREEMENTS TO MODIFY THIS LEASE MUST BE BY A SIGNED WRITING EXECUTED BY LESSOR AND LESSEE AND NO ATTEMPT AT ORAL MODIFICATION OR REVISION OF THIS LEASE OR ANY TERM HEREOF WILL BE BINDING. BY INITIALIZING THIS PROVISION LESSEE AGREES TO BE BOUND BY THE TERMS OF THIS LEASE AND TO THE EXTENT APPLICABLE THE PROVISIONS CONCERNING A SEPARATELY SIGNED DOCUMENT PURSUANT TO §2A-206 OF THE UNIFORM COMMERCIAL CODE HAS BEEN COMPLIED WITH. LESSEE EXPRESSLY WAIVES ALL OF ITS RIGHTS AND REMEDIES SET FORTH IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE, INCLUDING WITHOUT LIMITATION LESSEE'S RIGHTS, IF ANY, TO REPUDIATE, REJECT, REVOKE ACCEPTANCE, CLAIM A SECURITY INTEREST IN THE EQUIPMENT, OFFSET AND COVER. THIS LEASE AND ANY AND ALL MODIFICATIONS AND OTHER AGREEMENTS BETWEEN LESSOR AND LESSEE SHALL ONLY BE EFFECTIVE UPON EXECUTION BY AN OFFICER OF LESSOR.

X _____ LESSEE INITIALS

## LEASE ACCEPTANCE

Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease. THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM INDICATED HEREIN. INVESTIGATIVE CREDIT REPORT: Applicant authorizes MBF Leasing LLC, its assigns or its agents to obtain an investigative credit report from a credit bureau or a credit agency and to investigate the references given on any other statement or data obtained from Lessee.

Lessee's Signature/Title: Rhonda Garner /Pres.    Print Name: Rhonda Garner    Date: 1/5/05

## PERSONAL GUARANTY

To induce Lessor to make this Lease and purchase the Equipment for Lessee knowing that Lessor is relying on this Guaranty as a precondition to making this Lease, I, INDIVIDUALLY, PERSONALLY, ABSOLUTELY AND UNCONDITIONALLY GUARANTY to Lessor (and any person or firm Lessor may transfer its interests to) all payments and other obligations owed by Lessee to Lessor under this Lease and any add-on leases, Equipment Schedules and future leases between Lessor and Lessee, including, but not limited to, Lessor's attorney's fees and legal costs incurred in enforcing this Lease. I will pay all reasonable costs and fees incurred by Lessor in enforcing this Guaranty. I waive notice of demand and notice of default and I agree that Lessor may proceed directly against me without first proceeding against Lessee or the security (including the Equipment). This Guaranty shall be governed by the laws of New York. I FREELY CONSENT TO PERSONAL JURISDICTION IN THE STATE AND CITY COURTS AND FEDERAL COURTS WITHOUT LIMITATIONS THE CIVIL COURT OF THE CITY OF NEW YORK AND I WAIVE TRIAL BY JURY. This Guaranty will bind my heirs representatives and successors.

Personal Guarantor's Signature: _____ , An Individual    Date: 1/5/05

Print Name: Rhonda Garner    Home Telephone: (909) 866-8545

Home Address: 40716 BIG BEAR BLVD.    City: BIG BEAR LAKE    State: CA    Zip Code: 92315

Social Security #:

Credit Reference For Guarantor ☐ VISA ☐ MasterCard    Account Number:    Expiration Date:

## ACCEPTANCE BY MBF LEASING, LLC.

Signature/Title: _____ V.P.    Print Name:    Date: 2/1

MerchantServicesMBFstd 8/04

## LEASE TERMS

**1. LEASE TERM; RENTAL.**

MBF Leasing LLC, its successors and assigns (hereinafter "Lessor"), hereby leases to Lessee and Lessee hereby leases from Lessor the equipment described above together with any computer software including all manuals, updates revisions, program and data files, and documentation relating thereto or used or usable in connection therewith (the "Software") (hereinafter, with all replacement parts, repairs, additions, substitutions and accessories incorporated therein and/or affixed thereto, referred to as the "Equipment"), on terms and conditions set forth herein. From time to time Lessor and Lessee may execute one or more equipment schedules ("Equipment Schedules"). Each such Equipment Schedule relating to one or more items of Equipment shall be deemed a separate Lease incorporating all of the terms and provisions of this Lease. In the event of a conflict between the terms of this Lease and the terms and conditions of an Equipment Schedule, the terms and conditions of the Equipment Schedule shall govern and control that Equipment Schedule. This Lease shall commence (the "Commencement Date") on the date that the Equipment is accepted by Lessee (the "Acceptance Date") and continue thereafter until terminated as provided for herein. The Acceptance Date shall be the date Lessee is in receipt of the Equipment and, if applicable, the date the Software is transmitted to Lessee. If the Acceptance Date is other than the first day of a calendar month, then the Commencement Date of this Lease shall be the first day of the calendar month following the month which includes the Acceptance Date; and Lessee shall pay to Lessor, in addition to all other sums due hereunder, an amount equal to one-thirtieth of the amount of the average monthly rental payment due or to become due hereunder multiplied by the number of days from and including the Acceptance Date to the Commencement Date of this Lease. Unless otherwise provided herein, the monthly payments shall be payable on the first day of each month after the Commencement Date, in the amount stated above, until the total rent and all other obligations of Lessee shall have been satisfied and paid in full. All monthly lease payments of rent shall be made to Lessor by Automatic Clearing House ("ACH") transfer from Lessee's designated account as provided above. In the event Lessee has paid the first and last monthly lease payments without applicable taxes pursuant to Paragraph 7 hereof, Lessor may add such taxes to the first or a subsequent ACH transfer from Lessee's designated account as provided above. Lessee acknowledges that no interest will be paid on any advance lease payments.

**2. SOFTWARE.**

Lessee's right to use the Software is being acquired pursuant to a sub-license from Vendor to Lessee of a software license agreement between Vendor and the Licensor (collectively the "License"). Lessee reaffirms all of its rights and obligations under the License. Lessor is not a party to the License, but is an express third-party beneficiary. Lessee assigns to Lessor all of its rights and benefits, but Lessee retains all of the obligations and burdens under the License. Lessor sub-licenses back to Lessee, expiring upon the termination or expiration of this Lease or upon an Event of Default.

**3. PURCHASE AND ACCEPTANCE: NO CANCELLATION: NO WARRANTIES.**

Lessee requests Lessor to purchase the Equipment from Equipment Supplier or vendor ("Vendor") and arrange for delivery to Lessee and, Lessee shall pay all assessed costs for delivery and installation of Equipment. Lessor shall have no responsibility for delay or failure of Vendor to fill the order for the Equipment. LESSOR DID NOT SELECT, MANUFACTURE, LICENSE, SUPPLY OR INSPECT THE EQUIPMENT AND HAS NO EXPERTISE REGARDING THE EQUIPMENT. LESSEE HAS SELECTED VENDOR AND THE EQUIPMENT BASED ON LESSEE'S OWN JUDGMENT. LESSOR IS BUYING THE EQUIPMENT AT LESSEE'S REQUEST ONLY FOR THE PURPOSE OF LEASING IT TO LESSEE. Before signing this Lease, Lessee approved the supply contract (if any) between Lessor and Vendor and the License, (if any). Lessee has been advised in writing (or is now advised in this Lease) that Lessee may have rights against Vendor under the supply contract (if any) and the License, (if any) and that Lessee may contact Vendor or Licensor to find out what these rights against Vendor or Licensor are, (if any). THIS LEASE CANNOT BE CANCELLED BY LESSEE AT ANY TIME FOR ANY REASON. LESSEE'S DUTY TO MAKE THE MONTHLY LEASE PAYMENTS HEREUNDER IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE, LOSS OR ANY OTHER SETOFF, DEFENSE, COUNTERCLAIM OR OTHER CLAIM AGAINST THE VENDOR OR LICENSOR OR ANY OTHER PROBLEM INCLUDING THE REVOCATION OR TERMINATION OF THE LICENSE (IF ANY) OR OF ANY MAINTENANCE, SUPPORT OR OTHER SERVICES TO BE PROVIDED LESSEE THEREUNDER. LESSEE AGREES THAT LESSOR HAS MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, DIRECTLY OR INDIRECTLY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING THE SUITABILITY OF SUCH EQUIPMENT, ITS DURABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, ITS MERCHANTABILITY, ITS CONDITION, AND/OR ITS QUALITY. AS BETWEEN LESSEE AND LESSOR OR LESSOR'S ASSIGNS, LESSEE LEASES THE EQUIPMENT "AS IS". LESSOR AND LESSOR'S ASSIGNS SHALL NOT BE LIABLE TO LESSEE FOR ANY LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE CAUSED DIRECTLY OR INDIRECTLY (INCLUDING CLAIMS FOR GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL, DAMAGES OR FOR ANTICIPATORY PROFITS) BY ANY EQUIPMENT LEASED HEREUNDER OR THE USE OR MAINTENANCE THEREOF, OR THE FAILURE OF OPERATION THEREOF, OR REPAIRS, SERVICE OR ADJUSTMENT THERETO, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY THEREOF, OR BY ANY INTERRUPTION OF SERVICE OR LOSS OF USE THEREOF, OR THE USE THEREOF IN VIOLATION OF THE RIGHTS OF ANY PARTY WHOMSOEVER, OR FOR ANY LOSS OF BUSINESS OR DAMAGE WHATSOEVER AND HOWSOEVER CAUSED. NO REPRESENTATION OR WARRANTY AS TO THE EQUIPMENT OR ANY OTHER MATTER BY VENDOR SHALL BE BINDING ON LESSOR OR LESSOR'S ASSIGNS, NOR SHALL THE BREACH OF SUCH RELIEVE LESSEE OR, IN ANY WAY AFFECT, ANY OF LESSEE'S OBLIGATIONS TO LESSOR OR LESSOR'S ASSIGNS, AS SET FORTH HEREIN. LESSOR AND LESSOR'S ASSIGNS DISCLAIM AND SHALL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE OR INJURY TO PERSONS OR PROPERTY CAUSED BY THE EQUIPMENT WHETHER ARISING THROUGH THE NEGLIGENCE OF THE LESSEE OR IMPOSED BY LAW. LESSOR MAKES NO, AND SPECIFICALLY EXCLUDES ANY REPRESENTATION OR WARRANTY RELATING TO ANY SOFTWARE, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF TITLE, VALIDITY OR ENFORCEABILITY OF LICENSE, NON-INFRINGEMENT, AVAILABILITY OR QUALITY OF VENDOR OR LICENSOR SUPPORT, OR FITNESS FOR ANY PARTICULAR PURPOSE.

If the Equipment is not properly installed, does not operate as represented or warranted by Vendor or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against Vendor or Licensor and hereby waives and releases any and all rights to now or hereafter assert any claim against Lessor concerning the Equipment and shall nevertheless pay Lessor all rent payable under this Lease. Lessor agrees to assign to Lessee, solely for the purpose of making and prosecuting any such claims, any rights it may have against Vendor or Licensor for breach of warranty or representations respecting the Equipment.

NOTWITHSTANDING ANY FEES THAT MAY BE PAID TO VENDOR OR ANY AGENT OF VENDOR, LESSEE UNDERSTANDS AND AGREES THAT NEITHER VENDOR NOR ANY AGENT OF VENDOR IS AN AGENT OF LESSOR AND THAT NEITHER VENDOR NOR HIS AGENT IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THIS LEASE.

**4. LESSOR TERMINATION BEFORE EQUIPMENT ACCEPTANCE.**

If, within sixty (60) days from the date Lessor orders the Equipment, same has not been delivered, installed and accepted by Lessee in form satisfactory to Lessor, Lessor may on ten (10) days written notice to Lessee, terminate this Lease and its obligation to Lessee.

**5. TITLE.**

Lessor shall at all times retain title to the Equipment unless otherwise agreed to in writing. All documents of title and evidences of delivery shall be delivered to Lessor. Lessee shall not change or remove any insignia or lettering which is on the Equipment at the time of delivery thereof, or which is thereafter placed thereon, indicating Lessors ownership thereof. At any time during the term of this Lease, upon request of Lessor, Lessee shall affix to the Equipment in a prominent place, labels, plates or other markings supplied by Lessor stating that the Equipment is owned by Lessor. Lessor is hereby authorized by Lessee, at Lessee's expense, to cause this Lease, or any statement or other instrument in respect of this Lease showing the interest of Lessor in the Equipment, including Uniform Commercial Code Financing Statements, to be filed or recorded and refiled and re-recorded. Lessee agrees to execute and deliver any statement or instrument requested by Lessor for such purpose, and agrees to pay or reimburse Lessor for any filing, recording or stamp fees or taxes arising from the filing or recording of any such instrument or statement. Lessee shall, at its expense, protect and defend Lessor's title at all times keeping the Equipment free from all liens and claims whatsoever except for those created by or in favor of Lessor, its successor and/or assigns, and shall give Lessor immediate written notice thereof and shall indemnify Lessor from any loss caused thereby. Lessee shall execute and deliver to Lessor, upon Lessor's request, such further instruments and assurances as Lessor deems necessary or advisable for the confirmation or perfection of Lessor's rights hereunder. Lessee authorizes Lessor to file any such instrument, including, but not limited to, any Uniform Commercial Code Financing Statement(s), without Lessee's signature and, if the signature of Lessee is required thereon, Lessee irrevocably appoints Lessor as Lessee's attorney-in-fact to execute and file any such statement or other instrument in the name and on behalf of Lessee. It is the intention of the parties that the transaction(s) contemplated herein shall constitute an equipment finance lease and not a security interest of collateral assignment of the Equipment by Lessor. Notwithstanding the intention of the parties, if any court of competent jurisdiction shall hold that the transaction(s) contemplated herein constitute a security interest or collateral assignment and not an equipment finance lease of the Equipment by Lessor, then Lessor has a first lien security interest in the Equipment (including without limitation, the Software and general intangibles, licenses and intellectual Property rights with respect thereto, and all substitutions, modifications, replacements, additions, accessions, proceeds, and products of, to or for any of the foregoing) as of the date hereof to secure the obligations of Lessee, its successors and assigns, hereunder and Lessor shall have all rights and remedies of a secured party under the Uniform Commercial Code as adopted in any applicable jurisdiction. Notwithstanding anything contained herein to the contrary, the Software is subject to the exclusive proprietary rights of the Vendor or Licensor and Lessee shall have no ownership rights in the Software. Lessee shall have no right, title or interest in the Software except as set forth in the License and as specifically provided here.

**6. CARE AND USE OF EQUIPMENT.**

Lessee shall maintain the Equipment in good operating condition, repair and appearance, and protect the same from deterioration, other than normal wear and tear, shall use the Equipment in the regular course of business only within its normal capacity, without abuse and in a manner contemplated by Vendor, and in accordance with the License, shall comply with laws, ordinances, regulations, requirements and rules with respect to the use, maintenance and operation of the Equipment, shall not make any modification, alteration, or addition to the Equipment (other than normal operating accessories or controls or later or production versions and maintenance or enhancement releases related to and permitted under the License which shall when added to the Equipment, become the property of Lessor) without the prior written consent of Lessor, which shall not be unreasonably withheld, shall not so affix the Equipment to realty as to change its nature to real property or fixture, and agrees that the Equipment shall remain personal property at all times regardless of how attached or installed; shall keep and maintain the Equipment at the location shown above, and shall not remove the Equipment without the consent of Lessor, which shall not be unreasonably withheld. Lessee represents that the Equipment is being leased for business and/or professional purposes and agrees that under no circumstances shall this Lease be construed as a consumer contract. Lessor shall have the right during normal hours, upon reasonable prior notice to Lessee and subject to applicable laws and regulations, to enter upon the premises where the Equipment is located in order to inspect, observe or remove the Equipment, or otherwise protect Lessor's interest.

# LEASE TERMS

**7. NET LEASE: TAXES.**

Lessee intends the monthly lease payments hereunder to be net to Lessor, and Lessee shall pay all sales, use, excise, personal property, stamp, documentary, ad valorem, gross receipt, occupation and other taxes, license and registration fees, assessments, fines, penalties and other charges imposed on the ownership, possession or use of the Equipment during the term of this Lease. Lessor will add such taxes, fees and other charges to the monthly payments hereunder including handling and administration costs. To the extent that such taxes, fees and other charges are not imposed in equal monthly payments, Lessor may estimate the amount thereof and include a proportional amount with each monthly payment hereunder. Lessee agrees to pay such monthly amount as additional monthly rent during the term of this lease and any extension thereof. Upon Lessor's request, Lessee shall file all necessary returns and reports relating to such taxes, fees and charges. Lessee's obligations under this paragraph 7 shall survive the termination of this Lease.

**8. INDEMNITY.**

Lessee shall and does hereby agree to indemnify and save Lessor, its agents, servants, successors, and assigns harmless against and from any liability, damages, or loss, including reasonable counsel fees, arising out of the ownership, selection, manufacture, possession, leasing, renting, operation (regardless of where, how and by whom operated) control, use, condition (including but not limited to latent and other defects, whether or not discoverable by Lessee), maintenance, delivery, rejection, non-delivery and return or other disposition of the Equipment, and including but not limited to trademark, tort, anticipatory or consequential damages. The indemnities and obligations herein provided shall continue in full force and effect not withstanding termination of this Lease.

**9. RISK OF LOSS.**

Lessee hereby assumes the entire risk of loss, damage or destruction of the Equipment from any and every cause whatsoever during the term of this Lease and thereafter until redelivery to Lessor. No such loss or damage shall impair any obligation of the Lessee under this Lease which shall continue in full force and effect. In the event of loss, damage or destruction of any item of Equipment, Lessee shall promptly notify Lessor and shall at its expense (except to the extent of any proceeds of insurance provided by Lessee which shall have been received by Lessor as a result of such loss, damage or destruction), and at Lessor's option, shall either (a) repair such item, returning it to its previous condition, unless damaged beyond repair, or (b) pay Lessor all accrued and unpaid monthly lease and other payments, late charges and interest, plus an amount (the "Loss Amount") equal to (i) the net present value of all rental payments to become due during the remaining term of this Lease, discounted at a rate of six percent (6%) per annum plus (ii) the amount of any purchase option or obligation with respect to the Equipment, or, if there is no such option or obligation, the fair market value of the Equipment, as estimated by Lessor in its sole reasonable discretion, or (c) replace such item with a like item acceptable to Lessor, in good condition and of equivalent value, which shall become property of Lessor, included within the term "Equipment" as used herein, and leased from Lessor herewith for the balance of the full term of this Lease.

**10. INSURANCE.**

Lessee shall keep the Equipment insured against all risks of loss or damage from every cause whatsoever, in amounts determined by Lessor provided that in no event shall such insurance be less than the loss amount set forth in Section 9(b) herein above. The amount of such insurance shall be sufficient so that neither Lessor nor Lessee will be considered a co-insurer. Lessee shall also carry public liability insurance, personal injury and property damage, covering the Equipment. All such insurance shall provide that losses, if any, shall be payable to Lessor, and all such liability insurance shall include Lessor as named insured and require that the insurer give Lessor at least ten (10) days written notice prior to the effective date of any modification or cancellation thereof. All such policies shall provide that such insurance shall not be cancelled or modified, as against Lessor due to any act or neglect on the part of Lessee or of any other party. Lessee shall pay the premiums for such insurance and deliver to Lessor satisfactory evidence of the insurance coverage required hereunder, on or before the Commencement Date, as requested by Lessor. The proceeds of such insurance, payable as a result of loss or damage to any item of the Equipment, shall be applied to satisfy Lessee's obligations as set forth in Paragraph 9 above. Lessee hereby irrevocably appoints Lessor as Lessee's attorney in-fact to make claim for, receive payment of, and execute and endorse all documents, checks or drafts received in payment for loss or damage under any such insurance policy. In the event Lessee does not provide such evidence of insurance coverage, Lessee is deemed to have chosen to buy the Loss and Destruction waiver at the price in effect, which Lessor reserves the right to change from time-to-time. Under the Loss and Destruction waiver, Lessor will waive Lessee's responsibility for loss or destruction of the Equipment and for keeping the Equipment fully insured during the term of this Lease. Such waiver will provide that Lessee will be responsible for the first $200 with respect to each claim. After the loss or destruction of the Equipment, Lessor will provide for its replacement with equipment of comparable value at that time to the extent that Lessee took reasonable care in preventing the loss or destruction of the Equipment.

**11. DEFAULT.**

If any one of the following events (each, an "Event of Default") shall occur, then, to the extent permitted by applicable law, Lessor shall have the right to exercise any one or more of the remedies set forth in Paragraph 12 below: (a) Lessee fails to pay any monthly lease or any other payment hereunder when due, and such failure continues for five (5) days or (b) Lessee or any guarantor becomes insolvent or makes an assignment for the benefit of creditors, or (c) a receiver, trustee, conservator or liquidator of Lessee or any guarantor of all or a substantial part of the assets of Lessee or any guarantor is appointed with or without the application or consent of Lessee or such guarantor, or (d) a petition is filed by or against Lessee or any guarantor under the Bankruptcy Code or any amendment thereto, or under any other insolvency law providing for the relief of debtors, or (e) Lessee admits, in writing, of its inability to pay its debts, or (f) any of Lessee's property is attached, or (g) any action is taken to dissolve or liquidate Lessee by Lessee or any of its shareholders, partners or members, or (h) Lessee fails to pay when due any obligation to Lessor arising independently of this Lease and such failure continues for five (5) days, or (i) Lessee breaches any other covenant, warranty or agreement hereunder, and such breach continues for ten (10) days after the earlier of (i) the date on which Lessee obtains, or should have obtained, knowledge of such breach, or (ii) the date on which notice thereof shall be given by Lessor to Lessee, or (j) Lessee conveys, sells, transfers or assigns substantially all of Lessee's assets or ceases doing business as a going concern, or (k) Lessee breaches any term or condition of any License governing the right to use the Software.

**12. REMEDIES.**

If an Event of Default shall occur as described in Paragraph 11 hereinabove, Lessor may, at its option, at any time and without notice (a) declare immediately due and payable and recover from Lessee, as liquidated damages for the loss of a bargain and not as a penalty, an amount equal to all accrued and unpaid monthly lease payments, late charges, collection costs, and interest, plus the Loss Amount as set forth in Section 9(b) hereinabove; (b) without demand or legal process enter into the premises where the Equipment may be found and take possession of and remove the Equipment or render it unusable without removal, without liability for such retaking. Lessee, shall, upon demand of Lessor, assemble the Equipment and deliver it as directed by Lessor. Lessee waives any right to recover the Equipment and for any loss of use after an Event of Default has occurred. With respect to any Software, Lessee shall cease to use such Software and will assemble and deliver to Lessor the same in electronic or other form. Lessee shall remit to Lessor upon demand any amounts due and payable with respect to the licensing of the Software or the assignment thereof. Lessor may terminate any sub-license from Lessee and may request the Vendor and/or the Licensor to terminate any licenses with the Lessee and all maintenance support or other services under the License. Lessee agrees that monetary damages are not a sufficient remedy and will not adequately compensate Lessor for Lessee's breach and that Lessor shall be entitled to seek specific performance or other injunctive or equitable relief. Lessee may hold, sell or otherwise dispose of any such Equipment at a private or public sale. In the event Lessor takes possession of the Equipment, Lessor shall give Lessee credit for any sums received by Lessor from the sale or rental of the Equipment after deduction of the expenses of sale or rental. Lessee shall pay all of Lessor's recovery costs after a default, including: (i) attorney's fees equal to twenty-five percent (25%) of the amount of Lessor's claim or $1,500, whichever is greater; (ii) reasonable attorney's fees for obtaining an order, writ or similar process to recover possession of the Equipment; (iii) costs of suit; (iv) $250.00 to cover Lessor's internal collection overhead; (v) $225.00 to cover Lessor's internal repossession and remarketing overhead if an internal repossession is made or attempted; and (vi) all other reasonable out-of-pocket costs. Lessor and Lessee acknowledge the difficulty in establishing a value for the unexpired lease term and owing to such difficulty agree that the provisions of this paragraph represent an agreed measure of damages and are not to be deemed a forfeiture or penalty. In the event Lessee has provided a security deposit to Lessor, Lessor shall have the right to apply the security deposit to reduce the amount Lessee owes pursuant to this paragraph. In the event Lessee pays all obligations under this Lease and returns the Equipment to Lessor in accordance with paragraph 16, Lessor will return any security deposit to Lessee. No interest will be paid on the security deposit. All remedies of Lessor hereunder are cumulative, are in addition to any other remedies provided for by law, and may, to the extent permitted by law, be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy. No failure on the part of Lessor to exercise and no delay in exercising any right or remedy shall operate as a waiver thereof or modify the terms of this Lease.

**13. LATE PAYMENTS AND COLLECTION COSTS.**

Whenever any monthly lease payment is not made by Lessee in full when due hereunder, Lessee agrees to pay to Lessor, as a late fee, an amount equal to fifteen percent (15%) of the full scheduled payment, but not less than five dollars ($5.00) and only to the extent allowed by law. Such amount shall be payable in addition to all amounts payable by Lessee as a result of exercise of any of the remedies herein provided. In addition, Lessee will pay all out-of-pocket costs relating to or resulting from the collection of the late payment including a processing charge of $20.00 for each returned check, rejected ACH charge or returned credit card charge; and all reasonable collection costs incurred by Lessor. Payments shall be applied to late fees and to processing charges first and then to Lease obligations until all funds have been exhausted.

**14. ASSIGNMENT. NOTICE OF INTENDED ASSIGNMENT.**

Lessor may, without notice and without Lessee's consent, assign or transfer this Lease or any Equipment, rent or other sums due or to become due hereunder, and in such event Lessor's assignee or transferee shall have the rights, powers, privileges and remedies of Lessor hereunder. Lessee hereby acknowledges notice of Lessor's intended assignment of Lessor's interest in this Lease, and upon such assignment, Lessee agrees not to assert, as against Lessor's assignee, any defense, set-off, recoupment, claim or counterclaim, that it may have against Lessor whether arising under this Lease transaction or otherwise. LESSEE SHALL NOT ASSIGN THIS LEASE, THE LICENSE OR THE EQUIPMENT OR ANY INTEREST HEREUNDER AND SHALL NOT ENTER INTO ANY SUBLEASE WITH RESPECT TO THE EQUIPMENT OR THE LICENSE COVERED HEREBY WITHOUT LESSOR'S PRIOR WRITTEN CONSENT AND IF LESSOR SHALL PERMIT ANY SUCH ASSIGNMENT BY LESSEE, THE ASSIGNEE SHALL, AS A CONDITION TO LESSOR'S GRANTING OF CONSENT TO SUCH ASSIGNMENT, ASSUME LESSEE'S OBLIGATIONS HEREUNDER IN WRITING, IN FORM AND SUBSTANCE SATISFACTORY TO LESSOR, BUT NO SUCH ASSIGNMENT SHALL RELEASE LESSEE FROM ANY OF LESSEE'S OBLIGATIONS HEREUNDER.

## LEASE TERMS

**15. BUYOUT OPTION.**

Upon expiration of the lease term and provided no Event of Default shall have occurred and be continuing, Lessee shall have the option to purchase on an AS-IS, WHERE-IS basis, not less than all of the Equipment and an assignment of all of Lessor's rights, title and interest in the Software, if any) for its then fair market value, calculated as a percentage of the aggregate monthly lease payments in accordance with the following: If the term of this Lease is forty-eight (48) months or more, the buyout option as a percentage of the aggregate lease payments shall be ten percent (10%). If the term of this Lease is thirty-six (36) to forty-seven (47) months, the buyout option as a percentage of the aggregate lease payments shall be fifteen percent (15%). If the term of this Lease is twenty-four (24) to thirty-five (35) months, the buyout option as a percentage of the aggregate lease payments shall be twenty percent (20%). If the term of this Lease is twelve (12) to twenty-three (23) months, the buyout option as a percentage of the aggregate lease payments shall be twenty-five percent (25%). The exercise of this option must be communicated to Lessor in writing at least thirty (30) days prior to the expiration of the lease term. Purchase option payment will be due at lease expiration.

**16. RETURN OF PROPERTY.**

Lessee will notify Lessor in writing, at least 30 days prior to the Lease expiration, of Lessee's intention to return the Equipment. Within 10 days following the expiration of the Lease, Lessee shall deliver, freight prepaid, the Equipment to Lessor, at its address set forth above, complete and in good order and working condition, reasonable wear and tear alone excepted. Lessee shall assemble and deliver to Lessor all Software in electronic or other form as directed by Lessor. If any Software requires re-licensing, Lessee shall bear all costs related thereto and shall execute such documents as may be required. Lessee shall also pay to Lessor such sum as may be necessary to cover replacement for all damaged, broken or missing parts of the Equipment. If, upon such expiration or termination, Lessee does not return the Equipment to Lessor within ten (10) days after the expiration or termination of the term of the Lease, the Equipment shall continue to be held and leased hereunder and this Lease shall thereupon be extended on a month-to-month basis at the same monthly rental and upon the same terms and conditions set forth herein, subject to the right of either Lessee or Lessor to terminate the Lease upon one month's written notice, whereupon Lessee shall forthwith deliver the Equipment to Lessor as set forth in this Paragraph. If Lessee paid the last monthly lease payment at the time of the execution of this Lease, such payment shall be applied (without interest) to the last monthly lease payment upon the return by Lessee of the Equipment provided that no other sums are owing by Lessee to Lessor hereunder, in which event Lessor may apply such payment to any amount outstanding hereunder.

**17. EFFECTIVE DATE.**

This Lease shall become valid when executed and accepted by Lessor, notice of Lessor's acceptance of this Lease being hereby waived by Lessee.

**18. GOVERNING LAW.**

THIS LEASE AND ANY GUARANTY HEREOF SHALL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE INTERNAL LAWS OF THE STATE AND CITY OF NEW YORK.

**19. CHOICE OF FORUM FOR RESOLUTION OF DISPUTES.**

AS USED IN THIS PARAGRAPH 19, "APPLICABLE JURISDICTION" MEANS THE COUNTY OF NEW YORK, STATE OF NEW YORK AND CITY OF NEW YORK, OR SUCH OTHER COUNTY, STATE OR CITY, AS THE SAME MAY CHANGE FROM TIME TO TIME, WHERE THE HOLDER OF LESSOR'S INTEREST IN THIS LEASE MAINTAINS ITS PRINCIPAL OFFICE RESPONSIBLE FOR ADMINISTRATING THIS LEASE. ALL ACTIONS, PROCEEDINGS OR LITIGATION BROUGHT BY LESSOR OR LESSEE OR ANY GUARANTOR SHALL BE INSTITUTED AND PROSECUTED IN THE APPLICABLE JURISDICTION. THE PARTIES ACKNOWLEDGE THEIR AGREEMENT THAT THE STATE COURTS SITTING IN THE APPLICABLE JURISDICTION SHALL BE THE EXCLUSIVE FORUM FOR ALL ACTIONS; PROCEEDINGS OR LITIGATION BETWEEN OR AMONG THE PARTIES, NOTWITHSTANDING THAT OTHER COURTS MAY HAVE JURISDICTION OVER THE PARTIES AND THE SUBJECT MATTER; PROVIDED, HOWEVER, THAT ANY ACTION OR PROCEEDING BY LESSOR TO RECOVER POSSESSION OF THE EQUIPMENT (WHETHER DENOMINATED AS A REPLEVIN, SEQUESTRATION CLAIM AND DELIVERY OR OTHERWISE) MAY BE BROUGHT IN ANY COUNTY WHERE THE EQUIPMENT MAY BE FOUND. LESSEE AND GUARANTOR AGREE THAT ANY SUMMONS AND/OR COMPLAINT OR OTHER PROCESS TO COMMENCE ANY LITIGATION BY LESSOR WILL BE PROPERLY SERVED IF MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, WITH DELIVERY TO EITHER GUARANTOR, LESSEE OR LESSEE'S REGISTERED AGENT.

**20. WAIVER OF JURY TRIAL.**

LESSEE AND ANY GUARANTOR WAIVE, INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION BETWEEN OR AMONG LESSOR, LESSEE OR ANY GUARANTOR.

**21. SUBORDINATION.**

All indebtedness, now existing or hereafter arising, between Lessee and any guarantor is hereby subordinated to all present and future obligations of Lessee or any guarantor to Lessor, including, but not limited to, the Lease obligations, and, after the occurrence of an Event of Default, no payment shall be made or accepted on any such indebtedness due Lessee or any guarantor until all such obligations to Lessor are paid and satisfied in full.

**22. SURVIVAL OF GUARANTY OBLIGATIONS.**

All obligations of any guarantor shall remain enforceable notwithstanding that this Lease, or any obligations performed hereunder, may be void or voidable as against Lessee or any Lessee's creditors, including, but not limited to, a trustee in bankruptcy, by reason of any fact or circumstance.

**23. MISCELLANEOUS.**

This Lease contains the entire agreement between the parties and may not be altered, amended, modified, terminated or otherwise changed including by prior, contemporaneous or subsequent oral agreements, except in writing signed by an executive officer of Lessor. Lessee certifies that no such oral agreements exist. Lessor and Lessee intend this to be a valid and subsisting legal document, and agree that no provision of this Lease which may be deemed unenforceable shall in any way invalidate any other provision or provisions of this Lease, all of which shall remain in full force and effect. The undersigned certifies that he/she is authorized to execute this Lease on behalf of Lessee. Any notice intended to be served hereunder shall be deemed sufficiently sent if sent by regular mail, postage prepaid, addressed to the party at the addresses contained hereon. This Lease shall be binding upon the parties, their successors, legal representatives and assigns. All captions are intended to be descriptive only and shall not govern the Lease provisions.

**24. WAIVER; SEVERABILITY.**

No delay by Lessor in enforcing any rights under this Lease shall be interpreted as a waiver of said rights. If any provision of this Lease or the application thereof to any person, business entity, or circumstance is determined to be invalid, the remainder of this Lease, or the application of such provisions to any person, business entity or circumstances other than those to which it is held invalid, shall not be affected thereby.

---

**DEALER'S BILL OF SALE:**

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns, transfers and sets over the Equipment to MBF Leasing LLC. The undersigned represents and warrants to Lessor that the undersigned is the absolute owner of the Equipment, that the Equipment is free and clear of all liens, charges and encumbrances, and that the undersigned has full right, power and authority to make this bill of sale.

Seller: _UMS_____   Dated: _1/05/05_____

By: _muly_____

Title: _manager_____



**UNIVERSAL** ™
MERCHANT SERVICES
An Independent Sales Organization for First Third Payment Processing, Ohio, OH

# BUSINESS LICENSE AND VOIDED CHECK FORM

**BUSINESS LICENSE**



City of Big Bear Lake
39707 Big Bear Boulevard, P.O. Box 10000
Big Bear Lake, CA 92315-8900
(909) 866-5831

EXPIRATION DATE
09/30/05

LICENSE NUMBER
00024217

*Location of Business*

DATE ISSUED    SIC
10/18/04    5999

Decor Specialties
40715 VILLAGE DR
BIG BEAR LAKE, CA 92315

The entry shown is printed this certificate pursuant to License and Permit Provisions of the Municipal Code. This is not an endorsement of the activity nor certification of compliance with other laws.

Decor Specialties
P.O. BOX 1693
BIG BEAR LAKE, CA 92315

*Michael Perry*

This license must be displayed conspicuously at the location of business, and is not transferable or assignable.

**Voided Check**

DECOR SPECIALTIES, INC.
P.O. BOX 1693
BIG BEAR LAKE, CALIFORNIA 92315
(909) 866-8545

90-58

55

PAY

DOLLARS

FORM NO. 41RC-3
ORDERLAND.

**07 CV 5607**

**JUDGE CONNER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Rhonda Garner d/b/a Decor Specialties,
on behalf of herself and all others similarly
situated,

Index No.

                                        Plaintiffs,

        - against -

MBF Leasing, LLC, Lina Kravic, Brian
Fitzgerald, Sam Buono, and  William Healey,

                                        Defendants

Class Action Complaint
Jury Trial Demanded

### Nature of Action

1.      In this class action, Ms. Garner, a small business owner from California, asserts that Defendants conducted a fraudulent scheme to obtain signatures of small businessmen on what appear to be standard form one-page leases ("Lease"). Thereafter, Defendants (through the corporate Defendant) routinely collect through automatic electronic deductions much more than what is specified in the Lease, and foist several other liabilities on the unsuspecting small businesses.  Such illicit deductions also include a routine $4.95 every month towards what is in substance equipment insurance.  This collection is in direct violation of state laws regulating insurance.

2.      When small business owners (class members) raise questions, Defendants finally reveal the existence of 3 additional pages following the signature page, which 3 pages make the Lease irrevocable, onerous, and virtually indefinite. Routinely, these pages and their contents are never disclosed to the small business owners at the inception, and are not incorporated into the Lease.  Nevertheless, Defendants saddle small business owners with all these terms and enforce them

1

strictly, filing thousands of collection suits in the New York City Civil Court in Manhattan, and obtaining default judgments against small business owners residing all over the United States.[1]

3.    Moreover, when small business owners challenge the validity of the Lease and stop Defendants' automatic deductions from such businesses' accounts due to fraudulent inducement, or other valid reasons, Defendants promptly and routinely make inaccurate and false adverse entries in their personal credit reports. These reports are made unlawfully, maliciously and with willful intent to injure class members in order to intimidate them into paying unwarranted sums to Defendants. Accordingly, when notified of a dispute by the credit reporting agencies, Defendants refuse to investigate and/or to rectify the inaccurate reports.

4.    On these and related grounds, Ms. Garner asserts class claims against Defendants pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA"), New York Insurance Law §§ 1102 and 2102, as well the common law for fraud, conspiracy, concerted action, breach of contract, unjust enrichment, and money had and received. For herself and the class, Ms. Garner seeks compensatory, statutory, punitive and/or exemplary damages together with equitable and injunctive relief as well as attorneys' fees and expenses.

**Parties**

---

[1]The contract and the fraudulent scheme at issue here mirror those employed by Northern Leasing Systems, Inc., and are the subject matter of a class action lawsuit in New York Supreme Court, wherein the Appellate Division, First Department, has upheld claims for fraud, breach of contract, unjust enrichment, money had and received, and for punitive damages on the fraud and contract claims. Pludeman v. Northern Leasing Sytems, Inc., 2007 WL 1412500 (1st Dep't May 15, 2007).

2

5.      Plaintiff Rhonda Garner is a resident of Big Bear City, California, doing business under the name and style of Décor Specialties.

6.      Defendant MBF Leasing LLC ("MBF") is a New York limited liability company with its principal offices in Manhattan.  Upon information and belief, MBF is a micro-ticket leasing company affiliated with Northern Leasing Systems, Inc.  MBF claims to be an equipment finance lessor specialising in the lease financing of electronic point of sale equipment.

7.      The individual Defendants comprise the senior management of MBF, and are the masterminds behind the fraudulent scheme at issue.  Defendant Healey is the President of MBF, and as such, responsible for the operations and conduct of the entire organization.  Defendant Buono is the Vice President of MBF.  Defendant Kravic is the Operations Manager of MBF, who is primarily responsible for MBF's originations and operations.  Defendant Fitzgerald is the Executive Vice President of MBF's business development.

### Jurisdiction & Venue

8.      Subject-matter jurisdiction exists pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims arise, inter alia, under federal laws and statutes including without limitation, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq.

9.      Jurisdiction also exists pursuant to the general diversity statute, 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA").  Diversity exists between the parties to this class action and the amount-in-controversy is at least $5,000,000 in aggregate damages on behalf of the Class, exclusive of interest and costs.  Plaintiff Garner is a citizen of California.

3

Defendant MBF is a citizen of New York.

10.    This Court has pendent, supplemental or ancillary subject-matter jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367(a) insofar as those claims arise from a common nucleus of fact concerning the same course of conduct between the same parties.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside and/or do business in this Judicial District and a substantial portion of the activities giving rise to Plaintiffs' claims took place in this Judicial District.

### Class Action Allegations

12.    Plaintiff brings this action pursuant to Rule 23, Fed. R. Civ. P., on behalf of a Class consisting of herself and all other persons in the United States who are lessees or guarantors under leasing or financing contracts with the Defendant MBF whereunder MBF (as lessor, or as assignee of the lessor) purported to Lease business equipment, and/or persons in whose credit reports Defendants made inaccurate/incomplete credit entries.  The Class excludes Defendants, or any parent, subsidiary, affiliate, accountant, agent, attorney, employee, officer, representative, servant, and/or any person acting on behalf of Defendants or any of them.

13.    MBF does business throughout the United States, and enters into the Lease by itself directly as well as through third party vendors.  Thus, it is clear that tens of thousands of persons have signed the Lease with MBF and continue to do so. Clearly, the Class is so numerous that joinder of all of the members is impracticable.

14.    Plaintiff's claims are typical of the claims asserted on behalf of the Class.

4

15.    Plaintiff does not have any interests that are adverse or antagonistic to those of the Class.

16.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

17.    Upon information and belief, MBF's leasing and financing contracts involve financing of items that sell for under $10,000.  Thus, individual compensatory damages of most Class members are likely to be relatively small and hence, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the Class would prosecute individual actions. And if they did, such individual prosecution would be impracticable as well as inefficient.

18.    Plaintiff is not aware of any pending litigation concerning the claims herein.

19.    This Court is the most appropriate forum for adjudicating the claims at issue, which arise under federal statutes and common law.  The Lease contains a New York choice of law provision, and further, designates New York as a forum State (although MBF or its successor-in-title has the unilateral prerogative to change that). MBF is a New York corporation.  The principal offices of all Defendants are in this judicial district.

20.    Plaintiff does not anticipate any difficulty in the management of this action as a Class action.

21.    There are many questions of law and fact common to the Class which predominate over any questions which may affect individual members.  The

predominant common questions of law and fact include, among others:

    a.    Whether Defendants are liable for Fraud?

    b.    Whether Defendants are liable for violation of FCRA?

    c.    Whether Defendants are liable for violation of New York's Insurance Law?

    d.    Whether MBF is liable for Breach of Contract?

    e.    Whether MBF is liable for Unjust Enrichment?

    f.    Whether MBF is liable for Money Had and Received?

    g.    Whether Plaintiff is entitled to equitable and injunctive relief against Defendants;

    h.    Whether Plaintiff is entitled to compensatory damages, and if so the measure of such damages; and

    i.    whether Plaintiff is entitled to punitive damages, and if so, the measure of such damages.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

### Factual Allegations

23.    Defendants claim to be in the business of financing equipment for small businesses through so-called "equipment finance lease" contracts, the Lease. Typically, these transactions involve small equipment such as point-of-sale credit card swiping machines.

24.    Defendants designed and perpetrated, and continue to perpetrate, a fraudulent scheme to defraud small business owners (Class members) by willfully concealing, and/or orchestrating the concealment of material facts, and by charging and

6

collecting significantly higher amounts than those represented to Class members.

25.    Defendants, through their own representatives or allegedly independent "vendors", approach Class members, ostensibly offering credit card processing arrangements. These representatives or allegedly independent "vendors" obtain Class members' signatures on the Lease which has been drafted and prepared by Defendants.

26.    To facilitate this fraudulent scheme, Defendants drafted the Lease such that Class members have to sign on the very first page of the Lease And Personal Guaranty. Since the signature of parties to a document is always at the end of the document, Class members are led to believe that the Lease is a one page document containing all terms of the Lease.

27.    Moreover, the first page of Defendants's Lease appears to be a complete document. It contains all the material information usually expected in a small business transaction (name, address, bank preauthorization, amount, equipment information, term, bank information) and signature blocks for both parties.

28.    The first page of Defendants's Lease contains nothing incorporating the remaining three pages, or even alerting Class members to the existence of additional pages that may be part of the Lease terms. It says expressly:

> Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease.

This statement appears in a box under the caption "Lease Acceptance", which box also contains the space for Class members' signature.

29.    That "Lease Acceptance" box is followed by two other boxes in the

7

same page.  One provides for Class members' personal guaranty, and the other is for signature of acceptance by Defendants.

30.    Thus, the first page effectively conveys that the Lease is a one-page document.  Class members are routinely led to believe, and do believe, that the Lease comprised of just that one page.

31.    A fineprint – indeed, microprint – at the bottom of that page, tucked away in the far left corner of the page reads "page 1 of 4".  Obviously, the placement and size of the print, which is difficult to read even if noticed, does nothing to enable Class members detect or inquire about additional terms.  This is obviously a part of Defendants's fraudulent scheme: when Class members complained about not ever having been aware of the existence of the additional three pages, Defendants routinely relied on this microprint, flatly disclaimed their agent's misrepresentations, and self-righteously blamed Class members for allegedly not having read the microprint.

32.    Consistent with this fraudulent scheme, Defendants' representatives or salesmen selling Defendants' Lease never discuss, mention, or even refer to the remaining three pages.  No copy of the Lease is ever left with class members at the time of signing; instead, they are simply told that a copy will be mailed to them.

33.    Defendants are also aware (at the very least) that their representatives and salesmen routinely do not give a copy of the Lease to Class members.  In fact, Defendants have a special hotline for class members requesting copies of the Lease.  Thus, Defendants are well aware of the  routine concealment of 3 of the 4 pages of the Lease And Personal Guaranty.

34.     Thus, the first page of the Lease is the only one routinely seen by

Class members.  As the Appellate Division held while reviewing the substantially similar

standard-form contract under the name of Northern Leasing,

> The alleged concealment finds support in the first page of
> the lease, which contains all of the elements that would
> appear to form a binding contract, including the signature
> line, a personal guaranty, and forum selection, jury waiver
> and merger clauses, with the only references to the
> additional pages of the Lease being in very small print (see
> Broder v. MBNA Corp., 281 A.D.2d 369, 370 [2001] ).
> Further tending to show an intentional and deceptive
> concealment are allegations that defendants did not provide
> plaintiffs with fully executed copies of the leases and
> overcharged them by deducting amounts from their bank
> accounts greater than those called for by the leases.

Pludeman, 2007 WL 1412500, at *1.

35.     Accordingly, the terms contained in the remaining 3 pages cannot

be said to have been agreed to by the Class members.  They are not incorporated into

the Lease and Personal Guaranty, they appear after the signatures of Class members,

and hence, may not be enforced against them under New York law.

36.     Defendants' representatives and salesmen fraudulently sell Class

members the Lease for extortionately overpriced items at extremely onerous terms.

These items are typically available in the market for outright purchase, free and clear, at

a small fraction of the price of Defendants' "lease" prices.[2]  Worse, Defendants routinely

---

[2]The Attorney General of Missouri recently commenced a lawsuit against MBF affiliate
Northern Leasing, wherein he asserted that Lease contracts signed by Missouri
businesses were altered - as occurred here in California with Ms. Garner - in order to
obligate them to four-year leases that could not be canceled and to pay as much as
$4,000 for a machine worth about $300.  Missouri Attorney General's News Release,
"Firm that leases credit card machines defrauded small businesses in Missouri of

9

deduct significantly higher amounts than those specified in the first page. When

challenged, they refer class members to provisions in the hitherto undisclosed 3 pages.

      37.    By routinely concealing the additional pages of the Lease and

Personal Guaranty, Defendants have been wilfully causing, enabling, permitting, and

encouraging their representatives/salesmen to misrepresent the terms and effects of

the lease, and the obligations being personally guaranteed by the Class members.

Such representatives/salesmen routinely give an innocuous picture of the Lease,

pointing to the only page disclosed to the Class member and not saying one word about

the grossly inequitable and oppressive terms contained in the remainder of the pages.

Defendants routinely disclaim all such representations made at Lease inception, and

point to the merger clause; this enables Defendants' representatives and salesmen to

make misrepresentations with abandon – anything to clinch the sale.

      38.    Defendants and their salesmen fail to disclose to Class members

the harsh terms of the transaction contained in the 3 undisclosed pages. Thus,

Defendants conceal from Class members:

    a.    That according to Defendants, the Lease entitled MBF to charge sums

        which were significantly higher than those specified in the first page;

    b.    That the automatic electronic deductions from Class members' bank

        accounts, and Class members' other Lease obligations, would continue

        indefinitely unless Class members gave a specific advance 30-day notice

        of cancellation, with a buyout balloon payment, at the end of the specified

---

thousands of dollars, Nixon says," Apr. 9, 2007
(http://www.ago.mo.gov/newsreleases/2007/040907b.htm)

10

term;

c.      That the Lease purports to immunize MBF from any warranties for the
        equipment;

d.      That although  MBF retained title to the equipment leased, it was not
        answerable for any failure or malfunction of the equipment;

e.      That the Class member's obligation to pay MBF was absolute,
        non-cancellable and based solely on acceptance of the item leased;

f.      That the Class member had insurance obligations to MBF with respect to
        the equipment leased;

g.      That in case of an alleged default, MBF could "without demand or legal
        process enter into the premises where the equipment may be found and
        take possession of and remove the equipment without liability for such
        retaking;"

h.      That the charges for late payment of monthly dues were an extortionate
        15%, with a minimum of five dollars;

i.      That in case of litigation, Class members were obligated to pay MBF's
        attorneys' fees and expenses but MBF had no such obligation even if the
        Class member prevailed;

j.      That any litigation would be in a forum far away from Class members'
        homes and which forum was chosen and could be changed by MBF or its
        successor-in-title to the Lease and Personal Guaranty; and

k.      That MBF  - but not Class members - could effect service of process for a
        legal proceeding by certified mail, return receipt requested.

11

39. Moreover, in the event of default, Defendants routinely proceed against the guarantor personally.

40. Worse, Defendants promptly make inaccurate and adverse credit entries in the guarantor's personal credit report even before they commence legal proceedings against the primary obligor, the lessee business, or establish the validity of the Lease against a fraud claim.

41. Defendants' approach to collection is aggressive. They use the undisclosed provisions described above to the fullest extent possible to obtain payment from Class members, including sending them phony "summons" and complaints, dunning them with collection letters, and obtaining default judgments against those who refuse to pay.

42. Defendants' representatives uniformly intimidate Class members with endless phone calls, and expressly telling them that it would be more expensive for such Class members to litigate Defendants's claims in New York than it would be to pay off Defendants.

43. When Defendants commence legal proceedings, Class members rarely have the opportunity to raise any defenses. Defendants have hitherto been regularly filing their collection suits in New York, despite the fact that most of the Class members reside in far away states. Few if any can afford the expense of litigation in a distant forum, and obviously, most cases would end in default judgments. Thus, Class members have no real opportunity to raise defenses to the lawsuit.

44. Even Class members who do obtain counsel are hampered by the misleading Lease. Courts typically take individual contracts at face value unless there

12

is evidence that the Lease is part of pattern and practice of fraud and deception.  Given the amounts and controversy, typically under $5,000, it would be extremely difficult for consumer protection lawyers to develop the requisite evidence.  Finally, the potential witnesses for Class members are likely to be in his/her local area, and quite far from the New York court.[3]

45.    Obviously, once a judgment is entered in the New York courts, it is almost impossible for Class members to challenge Defendants in the subsequent judgment enforcement actions.  Had Defendants filed the suits in the Class members' home location to enforce their claims, they might have been able to defend it properly and prevail on counterclaims for fraud.

46.    Defendants add to the injury by imposing outrageous fees for late payments, as well as for attorney's fees and expenses.  Obviously, these fees provide significant profits to Defendants.  In many cases, by the time Defendants commence collection, these charges substantially increase the total payments due.

47.    Defendants are totally unconcerned and unresponsive to class members' complaints concerning fraudulent misrepresentations of their representatives or salesmen, undisclosed terms of the Lease, nonfunctioning equipment, or anything else.  Instead, they rely heavily on the wording of the undisclosed 3 pages of the Lease to slam complaining Class members that no defense exists to Defendants' demand for

---

[3]Defendants' misuse of New York courts with hundreds of such lawsuits based on fraudulent documents was the subject of an ABC news broadcast recently. http://abclocal.go.com/wabc/story?section=news&id=4870939 ("Is a corporation scamming small businesses?"), which was broadcast on New York channel 7 on May 17, 2007.

payment.

48.    Furthermore, Defendants routinely harass their class members by wilfully making inaccurate reports to credit reporting agencies in order to damage Class members' personal credit ratings. Defendants' malice and willful intent to injure is clear from Defendants' pattern and/or practice of furnishing such adverse information against the **personal** credit report of individual guarantors, i.e. business proprietors or sole owners, immediately upon alleged default of the lessee, despite serious issues about fraud, misrepresentations and other legal misconduct voiding the Lease and personal guaranty.

49.    When credit reporting agencies notify Defendants of a dispute raised by class members, Defendants routinely and wilfully fail to investigate and/or correct the inaccurate information they provided to the agency. This drastically affects class members' individual credit scores with serious adverse financial consequences.

50.    Defendants also routinely and improperly access the credit reports of individual Class members without authorization. Such illicit access also affects class members' credit scores adversely.

51.    Defendants also routinely charge an insurance premium - labeled "loss & damage waiver" ("LDW") - of $4.95 per month per equipment leased. This premium is never disclosed to class members at the inception, but simply clandestinely added to the monthly amounts automatically deducted by Defendants. Moreover, such premium is being collected without license or authorization required under state law, and in violation of the insurance laws of various states and New York.

### Plaintiff's Transactions

14

52.    On or about January 5, 2005, Ms. Garner and her business were approached by Defendants' agent. Relying on that agent's misrepresentations,[4] she signed the Lease.

53.    The Lease did not reveal the insurance premium of $4.95, and Ms. Garner and her business were unaware of this premium. Nevertheless, Defendants collected this premium through automatic deductions from her business account with the bank. Thus, instead of the $69.99 reflected in the first page of the Lease, Defendants deducted $80.36 from her business account every month.

54.    Further, the information under "Schedule of Payments" and "Equipment information" was blank when Ms. Garner signed the Lease. It was filled in later by Defendants or their agents, reflecting an alleged agreement for $69.99 a month for 4 years. In fact, Ms. Garner had put her store up for sale at that time, and already owned the equipment she had; obviously, she would never have agreed to the 4 year Lease.

55.    The equipment under the Lease was dysfunctional, and Ms. Garner attempted to cancel the transaction without any penalty as had been promised by Defendants' agent. She was eventually given MBF's telephone number. When she called MBF seeking instructions about return of the machine, MBF curtly informed her

---

[4]In addition to the concealment of the insurance premium of $4.95, these misrepresentations were (a) that Ms. Garner would pay rates lesser than what she was paying then; (b) the machine leased was a state of the art, reliable, and new equipment which would perform much better than her existing machine; (c) if the machine performance was unsatisfactory, Ms. Garner could simply return the machine with no penalties. Each of these representations was false. The rates were higher, and the machine was unreliable and caused her to manually input the credit card information which led to customer delays and higher rates from the bank.

15

that she would have to continue paying the monthly amount for 4 whole years whether the machine functioned or not.

56.    Ms. Garner arranged with her bank to stop the automatic deductions whereupon MBF promptly commenced its usual dunning calls and collection letters, and wilfully made an inaccurate adverse entry in Ms. Garner's personal credit report. Ms. Garner disputed the entry, but Defendants never rectified the inaccurate entry. Instead, Defendants wilfully attempted to intimidate her into paying over $3,600 for equipment that she didn't need, want, or desire, and which was totally worthless to her.

57.    As a result, Garner suffered damages for which Defendants are liable.

## COUNT I

(Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)

58.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

59.    Defendants violated the Fair Credit Reporting Act. As furnishers of information, Defendants provided inaccurate and incomplete information to credit reporting agencies against Ms. Garner and class members who guaranteed its Leases.

60.    Upon receipt of notices of dispute from credit reporting agencies, Defendants wilfully and routinely, and/or in reckless disregard of their statutory and civil obligations, failed to conduct an investigation and/or to correct inaccurate or incomplete information provided to the credit reporting agency.

61.    Ms. Garner and members of the Class were injured thereby.

16

62.    Accordingly, Ms. Garner and the Class are entitled to compensatory or statutory damages in addition to punitive damages and attorneys' fees and costs.

## COUNT II

### (Violation of New York Insurance Law §§ 1102, 2102

63.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

64.    Defendants collected, and continue to collect, $4.95 per equipment per month from each class member towards LDW.  Such charge is a premium for obtaining insurance on the leased property.   The LDW constitutes insurance under New York Insurance Law.  New York Ins. Law § 1101.

65.    Defendants are not authorized or licensed to engage in the insurance business in New York or any other state.  Defendants' collection of this insurance premium is without a license or authorization as required by New York Insurance Law, and clearly illegal, N.Y. Ins. Law §§ 1102, 2102.

66.    Defendants' collections are thus, illegal, and Ms. Garner and members of the Class have been injured as a result of Defendants' unlawful conduct.

67.    Accordingly, Ms. Garner and the Class are entitled to disgorgement/restitution, damages and/or equitable relief as permitted under state law.

## COUNT III

### (Breach of Contract against MBF)

68.    Ms. Garner repeats and realleges each and every allegation set

17

forth in all of the foregoing paragraphs as if fully set forth herein.

69.    By charging and collecting sums in excess of those specified in the first page of the Lease, and by imposing undisclosed amounts towards alleged taxes and insurance coverage, MBF breached the contracts at issue. As a result of such breach, Plaintiffs and the putative Class sustained damages.

70.    Moreover, Defendants' fraudulent motive and tortious conduct was aimed at the public generally. Their wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable. Defendant MBF is therefore liable to pay punitive damages to Ms. Garner and the Class. In <u>Pludeman</u>, the Court expressly upheld a claim for punitive damages based on substantially similar conduct.

71.    MBF is therefore liable to pay Class Plaintiffs and other Class members compensatory damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate. In addition, Class Plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

**COUNT IV**

(Fraud)

72.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

73.    Defendants conducted a fraudulent scheme to entrap Class members into highly overpriced leases with extremely onerous terms. They also wilfully and knowingly concealed material facts from Class Plaintiffs and other Class members,

18

and routinely failed to give them a copy of the Lease or even reveal the existence of more than the first page of the Lease. Defendants also knew the material nature of the facts that they willfully concealed from Class members, and that Defendants ought to have disclosed these facts at that time to the Class members. Defendants had superior knowledge not available to Class Plaintiffs and other Class members; as such, they had the duty to disclose the facts. Class Plaintiffs and other Class members relied upon Defendants' representations, and were unaware of the falsity or misleading nature of the representations. Class Plaintiffs and other Class members' reliance was reasonable under the circumstances. As a result of such reliance, Class Plaintiffs and other Class members sustained damages.

74.     By engaging in the conduct described above, Defendants committed a fraud upon Class Plaintiffs and other Class members.

75.     Moreover, Defendants' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable. Defendants are therefore liable to pay punitive damages to Ms. Garner and the Class. In Pludeman, the Court expressly upheld a claim for punitive damages based on substantially similar conduct.

76.     Defendants are therefore liable to pay Ms. Garner and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate. In addition, Ms. Garner and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

19

## Count V

### (Concerted Action)

77.    Ms. Garner reiterates the contents of the paragraphs hereinabove.

78.    Defendants had an agreement or understanding between themselves, whether express or tacit, to participate in a common plan or design to commit the aforesaid tortious acts.  Each person acted tortiously, and committed a tort in pursuance of the said agreement or understanding.  Accordingly, the actions of each person are attributable to every other person and MBF.

79.    Defendants are therefore liable to pay the class damages in such amount as may be appropriate after discovery and trial.

## Count VI

### (Civil Conspiracy)

80.    Ms. Garner reiterates the contents of the paragraphs hereinabove.

81.    Defendants conspired with the other(s) to participate in a common plan or design to commit the aforesaid tortious acts.  Each of them acted tortiously, and one or more of the said persons committed tort(s) in pursuance of the agreement or understanding.  Accordingly, the actions of each person are attributable to every other person and MBF.

82.    Defendants are therefore liable for civil conspiracy to pay the class damages in such amount as may be appropriate after discovery and trial.

20

**COUNT VII**

(Money Had and Received)

83.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

84.    By the aforesaid unlawful acts, MBF unlawfully billed and collected money that it was not entitled to. It received money belonging to Ms. Garner and Class members. MBF benefitted from the receipt of money, and under principles of equity and good conscience, it should not be permitted to keep the money.

85.    MBF must not be permitted to take advantage of its own wrong and retain, collect, or continue collecting such money.

86.    MBF is liable to pay Class Plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

**COUNT VIII**

(Unjust Enrichment)

87.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

88.    By collecting the excessive charges aforesaid, MBF profited at the expense of Ms. Garner and other Class members. Equity and good conscience require that MBF be ordered to repay these sums to Ms. Garner and other Class members towards restitution.

89.    MBF must not be permitted to take advantage of its own wrong and

21

retain, collect, or continue collecting these illegal charges hereon.

90.     Moreover, MBF is liable to pay Class Plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

### JURY TRIAL DEMAND

58.     Ms. Garner and the Class demand a jury trial on all issues so triable.

WHEREFORE, Ms. Garner and class members demand judgment against Defendants, jointly and severally,

    a.     determining that the instant action be maintained as a Class action under Rule 23 of the Federal Rules of Civil Procedure;

    b.     declaring that every Lease and financing agreement under MBF's standard form Lease is void and/or voidable at the option of the individual lessees/guarantors thereof (Class members herein) for fraud in the inducement;

    c.     declaring that pages 2-4 of all leases under MBF's standard form Lease are unenforceable against Ms. Garner and the Class members;

    d.     ordering Defendants to refund to Ms. Garner and to individual Class members all sums collected in excess of the amount specified in the first page of the Lease;

    e.     ordering Defendants to refund to individual Class members all sums collected on account of any judgment obtained by Defendants in a New York court (or in a court other than that of the individual Class members'

22

place of residence), based upon alleged breaches of the Lease by such individual Class members, and forthwith enter a satisfaction of all such judgments in the court wherein they were entered;

f.    awarding compensatory, and/or punitive damages to Ms. Garner and Class members in such amount, not less than $100 million, as may be determined after discovery and trial;

g.    awarding Ms. Garner and Class members the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements; and

h.    for such further and other relief as may be just and proper.

Dated:    New York, New York
            June 12, 2007

**Chittur & Associates, P.C.**

By: Krishnan Chittur, Esq. (KC9258)
286 Madison Avenue Suite 1100
New York, New York 10017
Tel: (212) 370-0447
Email: kchittur@chittur.com

And

Seth R. Lesser, Esq.
Locks Law Firm
110 East 55th Street
New York, New York 10022
Tel: (212) 838-3333
Attorneys for Plaintiff and the Class

Of counsel:
Rajan Sharma, Esq.

23

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Rhonda Garner d/b/a Decor Specialties,<br>on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MBF Leasing, LLC, Lina Kravic, Brian Fitzgerald,<br>Sam Buono, and William Healy,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 07 CV 5607<br><br>Judge Conner |

**DECLARATION OF BRIAN FITZGERALD IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

I, BRIAN FITZGERALD, declare the following to be true:

1.      I am currently the Executive Vice President of Business Development for

MBF Leasing, LLC, the New York LLC that is named as a defendant in this action

("MBF LLC").  Although the main office of MBF LLC is located in New York City, I

have never had an office in New York City. My office is located at 283 West 83rd Street,

Burr Ridge, Illinois, 60527.  I have never had an office in New York.

2.      I became an employee of MBF LLC on January 19, 2006.  I understand

that the claims asserted in the Complaint involve an equipment finance lease and related

guaranty (the "Lease") that Plaintiff, Rhonda Garner, executed on January 5, 2005.  I was

not an employee of MBF LLC at the time the Lease was entered into, and did not become

an employee of MBF LLC for more than a year after that time.  I had absolutely no

involvement with, or knowledge of, Ms. Garner or the Lease, until being named in this

action as a defendant.  I have never met Ms. Garner, have never spoken to her, and have

1

never had any other communication with her.  I have not had any personal involvement in the collection or enforcement activities described in the Complaint.

3.      Since becoming employed by MBF LLC, I have been to New York for business exactly once, to attend a meeting in New York City.  That meeting took place shortly after I became an employee of MBF LLC.  The meeting had nothing to do with Ms. Garner or the Lease.  Other than that one business meeting, I have been to New York just once during the holidays for a vacation.

4.      I do not sign lease contracts on behalf of MBF LLC and I do not regularly transact any business in New York.  I have never signed a lease on behalf of MBF LLC.

5.      I have never lived in New York.  I have lived my entire life in Oak Park, Illinois.  I do not own any property in New York, do not have a bank account in New York, and do not have a mailing address in New York.

(continued on next page)

X

X

X

X

X

X

X

X

X

X

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this Declaration was executed by me on the 4th day of October, 2007.

.

BRIAN FITZGERALD