UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rhonda Garner, on behalf of herself and all others similarly situated,<br>               Plaintiff,<br><br>  - against -<br><br><br>MBF Leasing, LLC; Lina Kravic; Brian Fitzgerald; Sam Buono; and  William Healy<br><br><br>                 Defendants | Index No. 07 CV 5607<br>(WCC) (MDF)<br><br>**First Amended Class Action Complaint**<br><br>Jury Trial Demanded |

## Nature of Action

1.    This class action arises out of Defendants' nationwide scheme to defraud small businesspersons, and intimidate them into paying unwarranted sums of money to Defendants.[1]  Plaintiff Ms. Garner, a small businessperson from California, asserts class claims against Defendants pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA"), New York Fair Credit Reporting Act, N.Y. Gen. Bus. L., §380 et seq., New York Insurance Law §§ 1102 and 2102, as well the common law for conspiracy, concerted action, breach of contract, aiding and abetting breach of contract, unjust enrichment, money had and received, and defamation.  Ms. Garner seeks classwide compensatory, statutory, punitive and/or exemplary damages together with equitable and injunctive relief as well as attorneys' fees and expenses.

---

[1] The contract and the fraudulent scheme at issue here mirror those employed by Northern Leasing Systems, Inc., which scheme is the subject matter of a class action lawsuit in New York Supreme Court.  In that action, the Appellate Division, First Department, has upheld claims for fraud, breach of contract, unjust enrichment, money had and received, and for punitive damages on the fraud and contract claims. Pludeman v. Northern Leasing Sytems, Inc., 40 A.D.3d 366 (1st Dep't May 15, 2007).

**Parties**

2.      Plaintiff Rhonda Garner is a resident of Big Bear City, California.

3.      Defendant MBF Leasing LLC ("MBF") is a New York limited liability company with its principal offices in Manhattan. Upon information and belief, MBF is a micro-ticket leasing company affiliated with Northern Leasing Systems, Inc. MBF claims to be an equipment finance lessor specializing in the lease financing of electronic point of sale equipment.

4.      The individual Defendants comprise the senior management of MBF, and are the masterminds behind the fraudulent scheme at issue. At relevant times, Defendant Healy was the President of an Illinois entity by the same name (MBF Leasing), and as such had business relationships with Defendant MBF. The Illinois entity used substantially the same forms, and indulged in the same misconduct as are at issue here, at all relevant times.[2] Defendant Healy's present role in Defendant MBF's continuing scheme is known only to Defendants at this time.

5.      Defendant Buono is the Vice President of MBF. Defendant Kravic is the Operations Manager of MBF, who is primarily responsible for MBF's originations and operations. Defendant Fitzgerald is the Executive Vice President of MBF's business development.

6.      The individual Defendants' respective responsibilities and role in

_____

[2]Thus, for example, the Illinois entity's Form Lease, while purporting to have been issued from its offices in Burr Ridge, Illinois, also had a New York choice of law and forum selection clauses - although none of the parties to those Form Leases had anything to do with New York. Ms. Garner's alleged Form Lease of January 2005 is illustrative.

2

the misconduct and fraudulent scheme at issue are known only to themselves, and not known to Ms. Garner at this time.

## Jurisdiction & Venue

7.    Subject-matter jurisdiction exists pursuant to 28 U.S.C. §1331 in that Plaintiff's claims arise, *inter alia*, under federal laws and statutes including without limitation, the Fair Credit Reporting Act, 15 U.S.C. §§1681 <u>et seq.</u>

8.    Jurisdiction also exists pursuant to Diversity, 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"). Diversity exists between the parties to this class action and the amount-in-controversy is at least $5,000,000 in aggregate damages on behalf of the Class, exclusive of interest and costs. Plaintiff Garner is a citizen of California. Defendant MBF is a citizen of New York. Upon information and belief, Defendants Kravic and Buono are citizens of New York, while Defendants Healy and Fitzgerald are citizens of Illinois.

9.    This Court has pendent, supplemental or ancillary subject-matter jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367(a) insofar as those claims arise from a common nucleus of fact concerning the same course of conduct between the same parties.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the New York Defendants reside and/or do business in this Judicial District. Moreover, a substantial portion of the activities giving rise to Ms. Garner's claims took place in this Judicial District, and the claims arose in this Judicial District.

3

## Concerted Action Allegations

11.    Defendants acted, at all relevant times, pursuant to an agreement or understanding between themselves, whether express or tacit, to participate in a common plan or design to commit the wrongful acts complained of herein.  Each Defendant acted tortiously or wrongfully, or committed a tort or other wrongful and unlawful act, in furtherance of the agreement or understanding and in accordance with the common plan or design.

12.    Accordingly, each Defendant's actions are imputable to the others and each may be held liable for the conduct of all Defendants together.

## Class Action Allegations

13.    Plaintiff brings this action pursuant to Rule 23, Fed. R. Civ. P., on behalf of a class of herself and all other persons in the United States defined as follows:

a.    The "Impermissible Access" class (Counts I-II, V-VI, XII, XIII) comprised of all  persons who satisfy the following criteria:

i.    MBF accessed or caused to be accessed the person's credit report from a credit reporting agency; and

ii.    on the date MBF accessed, or caused to be accessed, it did not possess a written authority or instruction from such person allowing it to access the person's credit report; and

iii.    MBF did not do so for a "permissible purpose" as defined by law.

b.    The "Adverse Entry" class (Counts III-IV, VII-VIII, XII, XIII) comprised of all persons who satisfy the following criteria:

i.    MBF made or caused to be made an adverse entry on the person's credit report with a credit reporting agency or agencies;

ii.    Such person raised a dispute with one or more credit reporting agency or agencies with a request to investigate and rectify the error, and MBF was apprized or caused to be apprized of such request; and

iii.    MBF failed, neglected, and/or refused to delete or cause the deletion of the inaccurate entry.

c.    The Lesse/Guarantor Class (Counts IX - XV), comprised of all persons who signed or are alleged to have signed as lessees or guarantors under leasing or financing contracts with the Defendant MBF whereunder Defendant MBF (as lessor, or as assignee of the lessor) purported to lease business equipment, and/or persons in whose credit reports Defendants made inaccurate/incomplete credit entries; and

d.    The "Defamation" class" (Count XVI) comprised of all persons who allegedly signed as guarantors in Leases and in whose credit reports Northern Leasing made an adverse entry with one or more credit reporting agencies.

14.    The Classes exclude Defendants, or any parent, subsidiary, affiliate, accountant, agent, attorney, employee, officer, representative, servant, and/or any person acting on behalf of Defendants or any of them.

15.    MBF does business throughout the United States, and enters into the Form Lease by itself directly as well as through third party vendors. Thus, it is clear

5

that tens of thousands of persons have signed the Form Lease with MBF and continue to do so. Clearly, the Class is so numerous that joinder of all of the members is impracticable.

16.    Plaintiff's claims are typical of the claims asserted on behalf of the Class.

17.    Plaintiff does not have any interests that are adverse or antagonistic to those of the Class.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

19.    Upon information and belief, MBF's leasing and financing contracts involve financing of items that sell for under $10,000. Thus, individual compensatory damages of most Class members are likely to be relatively small and hence, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the Class would prosecute individual actions. And if they did, such individual prosecution would be impracticable as well as inefficient.

20.    Plaintiff is not aware of any pending litigation concerning the claims herein.

21.    This Court is the most appropriate forum for adjudicating the claims at issue, which arise under federal and New York statutes and common law. The Form Lease contains a New York choice of law provision, and further, designates New York as a forum State. MBF is a New York corporation. The principal offices of the New York Defendants are in this judicial district.

6

22.     Plaintiff does not anticipate any difficulty in the management of this action as a Class action.

23.     There are many questions of law and fact common to the Class which predominate over any questions which may affect individual members.  The predominant common questions of law and fact include, among others:

a.     Whether Defendants are liable for violation of FCRA?

b.     Whether Defendants are liable for violation of NYFCRA?

c.     Whether Defendants are liable for violation of New York's Insurance Law?

d.     Whether MBF is liable for Breach of Contract?

e.     Whether the individual Defendants are liable for Aiding and Abetting Breach of Contract?

f.     Whether MBF is liable for Unjust Enrichment?

g.     Whether MBF is liable for Money Had and Received?

h.     Whether Plaintiff is entitled to equitable and injunctive relief against Defendants;

i.     Whether Plaintiff is entitled to compensatory damages, and if so the measure of such damages; and

j.     whether Plaintiff is entitled to punitive damages, and if so, the measure of such damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

7

**Factual Allegations**

25.    Defendants claim to be in the business of financing equipment for small businesses through so-called "equipment finance lease" contracts, the Form Lease.  Typically, these transactions involve small equipment such as point-of-sale credit card swiping machines.

26.    Defendants designed and perpetrated, and continue to perpetrate, a fraudulent scheme to defraud small business owners (Class members) by willfully concealing, and/or orchestrating the concealment of material facts, and by charging and collecting significantly higher amounts than those represented to Class members.

27.    Defendants, through their own representatives or allegedly independent "vendors", approach Class members, ostensibly offering credit card processing arrangements.  These representatives or allegedly independent "vendors" obtain Class members' signatures on the Form Lease which has been drafted and prepared by Defendants.

28.    To facilitate this fraudulent scheme, Defendants drafted the Form Lease such that Class members have to sign on the very first page of the Form Lease. Since the signature of parties to a document is always at the end of the document, Class members are led to believe that the Form Lease is a one page document containing all terms of the transaction.

29.    Moreover, the first page of Defendants's Form Lease appears to be a complete document.  It contains all the material information usually expected in a small business transaction (name, address, bank preauthorization, amount, equipment information, term, bank information) and signature blocks for both parties.

8

30.    The first page of Defendants's Form Lease contains nothing incorporating the remaining three pages, or even alerting Class members to the existence of additional pages that may be part of the Form Lease terms. It says expressly:

> Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease.

This statement appears in a box under the caption "Lease Acceptance", which box also contains the space for Class members' signature.

31.    That "Lease Acceptance" box is followed by two other boxes in the same page. One provides for Class members' personal guaranty, and the other is for signature of acceptance by Defendants.

32.    Thus, the first page effectively conveys that the Form Lease is a one-page document. Class members are routinely led to believe that the Form Lease comprised of just that one page.

33.    A fineprint – indeed, microprint – at the bottom of that page, tucked away in the far left corner of the page reads "page 1 of 4". Obviously, the placement and size of the print, which is difficult to read even if noticed, does nothing to enable Class members detect or inquire about additional terms. This is obviously a part of Defendants's fraudulent scheme: when Class members complained about not ever having been aware of the existence of the additional three pages, Defendants routinely relied on this microprint, flatly disclaimed their agent's misrepresentations, and self-righteously blamed Class members for allegedly not having read the microprint.

34.    Consistent with this fraudulent scheme, Defendants'

9

representatives or salesmen selling Defendants' Form Lease never discuss, mention, or even refer to the remaining three pages. No copy of the Form Lease is ever left with class members at the time of signing; instead, they are simply told that a copy will be mailed to them.

35.    Defendants are also aware (at the very least) that their representatives and salesmen routinely do not give a copy of the Form Lease to Class members. In fact, Defendants have a special hotline for class members requesting copies of the Form Lease. Thus, Defendants are well aware of the routine concealment of 3 of the 4 pages of the Form Lease.

36.    In sum, the first page of the Form Lease is the only one routinely seen by Class members. As the Appellate Division, First Department, held while reviewing the substantially similar Form Lease issued by Northern Leasing,

> The alleged concealment finds support in the first page of the lease, which contains all of the elements that would appear to form a binding contract, including the signature line, a personal guaranty, and forum selection, jury waiver and merger clauses, with the only references to the additional pages of the Lease being in very small print (*see Broder v. MBNA Corp.,* 281 A.D.2d 369, 370 [2001] ). Further tending to show an intentional and deceptive concealment are allegations that defendants did not provide plaintiffs with fully executed copies of the leases and overcharged them by deducting amounts from their bank accounts greater than those called for by the leases.

Pludeman, 40 A.D.3d at 367.

37.    Accordingly, the terms contained in the remaining 3 pages cannot be said to have been agreed to by the Class members. They are not incorporated into the Form Lease, they appear after the signatures of Class members, and hence, may

10

not be enforced against them under New York law.

38.    Defendants' representatives and salesmen fraudulently sell Class members the Form Lease for extortionately overpriced items at extremely onerous terms. These items are typically available in the market for outright purchase, free and clear, at a small fraction of the price of Defendants' "lease" prices.[3]

39.    Moreover, Defendants routinely deduct significantly higher amounts than those specified in the first page. When challenged, they refer class members to provisions in the hitherto undisclosed 3 pages.

40.    By routinely concealing the additional pages of the Form Lease, Defendants have been wilfully causing, enabling, permitting, and/or encouraging their representatives/salesmen to misrepresent the terms and effects of the Form Lease, and the obligations being personally guaranteed by the Class members. Such representatives/salesmen routinely give an innocuous picture of the Form Lease, pointing to the only page disclosed to the Class member and not saying one word about the grossly inequitable and oppressive terms contained in the remainder of the pages. Defendants routinely disclaim all such representations made at Form Lease inception, and point to the merger clause; this enables Defendants' representatives and salesmen to make misrepresentations with abandon – anything to close the deal.

---

[3]The Attorney General of Missouri recently commenced a lawsuit against MBF affiliate Northern Leasing, wherein he asserted that Form Lease contracts signed by Missouri businesses were altered - as occurred here in California with Ms. Garner - in order to obligate them to four-year leases that could not be canceled and to pay as much as $4,000 for a machine worth about $300. Missouri Attorney General's News Release, "Firm that leases credit card machines defrauded small businesses in Missouri of thousands of dollars, Nixon says," Apr. 9, 2007 (http://www.ago.mo.gov/newsreleases/2007/040907b.htm)

11

41.    Defendants and their salesmen fail to disclose to Class members the harsh terms of the transaction contained in the 3 undisclosed pages. Thus, Defendants conceal from Class members:

a.    That according to Defendants, the Form Lease entitled MBF to charge sums which were significantly higher than those specified in the first page;

b.    That the automatic electronic deductions from Class members' bank accounts, and Class members' other Form Lease obligations, would continue indefinitely unless Class members gave a specific advance 30-day notice of cancellation, with a buyout balloon payment, at the end of the specified term;

c.    That the Form Lease purports to immunize MBF from any warranties for the equipment;

d.    That although MBF retained title to the equipment leased, it was not answerable for any failure or malfunction of the equipment;

e.    That the Class member's obligation to pay MBF was absolute, non-cancellable and based solely on acceptance of the item leased;

f.    That the Class member had insurance obligations to MBF with respect to the equipment leased;

g.    That in case of an alleged default, MBF could "without demand or legal process enter into the premises where the equipment may be found and take possession of and remove the equipment without liability for such retaking;"

h.    That the charges for late payment of monthly dues were an extortionate

12

15%, with a minimum of five dollars;

i.     That in case of litigation, Class members were obligated to pay MBF's attorneys' fees and expenses but MBF had no such obligation even if the Class member prevailed;

j.     That any litigation would be in a forum far away from Class members' homes and which forum was chosen and could be changed by MBF or its successor-in-title to the Form Lease ; and

k.     That MBF  - but not Class members - could effect service of process for a legal proceeding by certified mail, return receipt requested.

42.     Moreover, in the event of default, Defendants routinely proceed against the guarantor personally.

43.     Worse, Defendants promptly make inaccurate and adverse credit entries in the guarantor's personal credit report even before they commence legal proceedings against the primary obligor, the lessee business, or establish the validity of the Form Lease against a fraud claim.

44.     Defendants' approach to collection is aggressive.  They use the undisclosed provisions described above to the fullest extent possible to obtain payment from Class members, including sending them phony "summons" and complaints, dunning them with collection letters expressly threatening to trash their personal credit reports, and obtaining default judgments against those who refuse to pay.

45.     Defendants' representatives uniformly intimidate Class members with endless phone calls, and expressly telling them that it would be more expensive for such Class members to litigate Defendants's claims in New York than it would be to pay

off Defendants.

46.    When Defendants commence legal proceedings, Class members rarely have the opportunity to raise any defenses. Defendants have hitherto been regularly filing their collection suits in New York, despite the fact that most of the Class members reside in far away states. Few if any can afford the expense of litigation in a distant forum, and obviously, most cases would end in default judgments. Thus, Class members have no real opportunity to raise defenses to the lawsuit.

47.    Even Class members who do obtain counsel are hampered by the misleading Form Lease. Courts typically take individual contracts at face value unless there is evidence that the Form Lease is part of pattern and practice of fraud and deception. Given the amounts and controversy, typically under $5,000, it would be extremely unlikely that any lessee would develop the requisite evidence. Finally, the potential witnesses for Class members are likely to be in his/her local area, and quite far from the New York court.[4]

48.    Obviously, once a judgment is entered in the New York courts, it is almost impossible for Class members to challenge Defendants in the subsequent judgment enforcement actions. Had Defendants filed the suits in the Class members' home location to enforce their claims, such Class members might have been able to defend it properly, and even prevail on counterclaims for fraud.

---

[4]Defendants' misuse of New York courts with hundreds of such lawsuits based on fraudulent documents has not escaped media attention. *Is a Corporation Scamming Small Businesses?* http://abclocal.go.com/wabc/story?section=news&id=4870939 ("Is a corporation scamming small businesses?"), (broadcast on New York channel 7 on May 17, 2007); *Alleged Fraud Targeting Small Businesses?* (broadcast on New York channel 7 on June 12, 2007).

14

49.     Defendants add to the injury by imposing outrageous fees for late payments, as well as for attorney's fees and expenses. Obviously, these fees provide significant profits to Defendants. In many cases, by the time Defendants commence collection, these charges substantially increase the total payments due.

50.     Defendants are totally unconcerned and unresponsive to class members' complaints concerning fraudulent misrepresentations of their representatives or salesmen, undisclosed terms of the Form Lease, nonfunctioning equipment, or anything else. Instead, they resort to the terms of the undisclosed 3 pages of the Form Lease to slam complaining Class members that no defense exists to Defendants' demand for payment.

51.     Furthermore, Defendants routinely harass their class members by wilfully making inaccurate reports to credit reporting agencies in order to damage Class members' personal credit ratings. Defendants' malice and willful intent to injure is clear from Defendants' pattern and/or practice of furnishing such adverse information against the *personal* credit report of individual guarantors, i.e. business proprietors or sole owners, immediately upon alleged default of the lessee, despite serious issues about fraud, misrepresentations and other legal misconduct voiding the Form Lease.

52.     When credit reporting agencies notify Defendants of a dispute raised by class members, Defendants routinely and wilfully fail to investigate and/or correct the inaccurate information they provided to the agency. This drastically affects class members' individual credit scores with serious adverse financial consequences to such members personally.

53.     Defendants also routinely and improperly access the credit reports

15

of individual Class members for impermissible purposes under false pretenses.  Such

illicit access also affects class members' credit scores adversely.

54.    Furthermore, Defendants routinely charge an insurance premium -

labeled  "loss & damage waiver" ("LDW") - of $4.95 per month per equipment leased.

This premium is never disclosed to class members at the inception, but simply

clandestinely added to the monthly amounts automatically deducted by Defendants.

Moreover, such premium is being collected without license or authorization required

under state law, and in violation of the insurance laws of New York.

### Plaintiff's Transactions

55.    On or about January 5, 2005, Ms. Garner and her business were

approached by Defendants' agent in California.  Relying on that agent's

misrepresentations, and unaware of their falsity,[5] she signed the Form Lease, "Ex. A."

While the Form Lease was in the name of "Merchant Services," it appears to have been

accepted by Defendant MBF.

56.    Defendants did not reveal, whether in the Form Lease or otherwise,

the insurance premium of $4.95.  Consequently, Ms. Garner and her business were

unaware of this premium.  Nevertheless, Defendants collected this premium through

automatic deductions from her business account with the bank.  Thus, instead of the

---

[5]In addition to the concealment of the insurance premium of $4.95, these
misrepresentations were (a) that Ms. Garner would pay rates lesser than what she was
paying then; (b) the machine leased was a state of the art, reliable, and new equipment
which would perform much better than her existing machine; (c) if the machine
performance was unsatisfactory, Ms. Garner could simply return the machine with no
penalties.  Each of these representations was false.  The rates were higher, and the
machine was unreliable and caused her to manually input the credit card information
which led to unacceptable customer delays and higher rates from the bank.

$69.99 (plus taxes) reflected in the first page of the Form Lease, Defendants deducted $80.36 from her business account every month.

57.     Further, the information under "Schedule of Payments" and "Equipment information" was blank when Ms. Garner signed the Form Lease.  It was filled in later by Defendants or their agents, reflecting an alleged agreement for $69.99 a month for 4 years.

58.     In fact, Ms. Garner had put her store up for sale at that time, and already owned the equipment she had; obviously, she would never have agreed to the 4 year Form Lease.

59.     The equipment under the Form Lease was dysfunctional, and Ms. Garner attempted to cancel the transaction without any penalty as had been promised by Defendants' agent.  She was eventually given MBF's telephone number.  When she called MBF seeking instructions about return of the machine, Defendants curtly informed her that she would have to continue paying the monthly amount for 4 whole years whether the machine functioned or not.

60.     Ms. Garner arranged with her bank to stop the automatic deductions whereupon Defendants promptly commenced their usual dunning calls and collection letters.  Further, Defendants wilfully made or caused to be made an inaccurate adverse entry in Ms. Garner's personal credit report with Experian, a credit reporting agency.  Defendants falsely reported

a.     That Ms. Garner had personally opened an account with Defendants in "February 2005;"

b.     That Ms. Garner's personal account had a credit limit/original amount of

17

"$3,597;"

c.      That Ms. Garner's personal account was an "installment" loan for "48

months," with monthly payments due; and

d.      That Defendants had "charged off" $2,709 which Ms. Garner allegedly

owed on account of "Early termination/balance owing."

61.      On or about June 16, 2006, Ms. Garner raised a dispute with

Experian about Defendants' false and inaccurate report.  Upon information and belief,

Experian forwarded the dispute as required under the law.  Nevertheless, Defendants

wilfully refused to correct the inaccuracy, and falsely "verified" the alleged entry to

Experian.

62.      Indeed, Defendants went further and, after this lawsuit was

commenced, reported to Experian that they had "charge[d] off" the sum of "$2,870" as

of September 2007.

63.      Further, Defendants also wrongfully and unauthorizedly accessed

Ms. Garner's credit report with Experian repeatedly for purposes impermissible under

the law.  Thus, Defendants impermissibly accessed or caused to be accessed Ms.

Garner's credit reports on January 25, 2005, January 27, 2005, February 21, 2006,

June 12, 2006, and March 15, 2007.  None of these accesses were for the purpose of

extending credit or insurance to Ms. Garner.

64.      In addition, Defendants wilfully attempted to intimidate Ms. Garner

into paying over $3,600  for equipment that she didn't need, want, desire, wish, or use,

and which was totally worthless to her.

65.      Thus, for example, by letter dated March 15, 2007, to Ms. Garner

18

alone, entitled **"FINAL NOTICE"** in bold, Defendants threatened:

> [W]e are going to take the necessary steps to collect the balance due. This may include legal proceedings, and if reduced to Judgment will increase the monies due on this claim. Subsequently, you may be held liable for additional costs to enforce the Judgment in your state, such as placing a lien on real or personal property, Local Docketing, Wage Garnishment and Bank Restraints.

Letter of March 15, 2007.

66.    Nevertheless, Defendants proceeded to enter a default judgment for $2,869 against her in the New York City Civil Court on July 3, 2007 - at least 3 weeks after they had been served with the Summons and Complaint in this action.[6] Court records in the New York City Civil Court reveal that Defendants commenced that action on February 9, 2007 - about five weeks *before* their aforesaid letter threatening legal proceedings - and obtained a Judgment based on false assertions of default.

67.    The aforesaid Judgment was reported to the credit reporting agencies as part of Ms. Garner's credit report. It has adversely impacted, and continues to impact, Ms. Garner's credit score significantly.

68.    As a result, Ms. Garner suffered damages for which Defendants are liable.

### Count I

(Fair Credit Reporting Act, 15 U.S.C. §§1681b(f), 1681n:

Willfully Obtaining Consumer Reports Without A Permissible Purpose)

---

[6]Today, November 15, 2007, MBF's counsel in that action communicated his consent to vacate that default judgment.

19

69.    Ms. Garner realleges and incorporates the preceding paragraphs.

70.    Defendants willfully violated the FCRA by obtaining the consumer reports of Ms. Garner and class members without having a permissible purpose therefor, and/or under false pretenses.

71.    The individual Defendants conducted the business activities (for which MBF Leasing gave them responsibility) through repeated illegal accesses of consumer reports and the information contained therein, as described above. This misconduct was an integral part of Defendants' unlawful scheme at issue.

72.    These illegal acts affected a large number of unwitting consumers and persisted over at least a two year period, evidencing a pattern of Defendants' willfully violating the provisions of the FCRA.

73.    Defendants' acts in obtaining this information in willful violation of the FCRA without a permissible purpose and/or under false pretenses violate 15 U.S.C. §1681b(f).

74.    As a result of Defendants' aforesaid misconduct, Ms. Garner and the Class have sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses.

### Count II

((Fair Credit Reporting Act, 15 U.S.C. §§1681b(f), 1681o:

Negligently Obtaining Consumer Reports Without A Permissible Purpose)

75.    Ms. Garner realleges and incorporates the preceding paragraphs.

76.    Defendants violated the FCRA by negligently obtaining the consumer reports of Ms. Garner and class members, without having a permissible

20

purpose therefor and/or under false pretenses.

77.    The individual Defendants conducted the business activities (for which MBF Leasing gave them responsibility) through repeated illegal accesses of consumer reports and the information contained therein, as described above. This misconduct was an integral part of Defendants' unlawful scheme at issue.

78.    These illegal acts affected a large number of unwitting consumers and persisted over at least a two year period, evidencing a pattern of Defendants' negligently violating the provisions of the FCRA.

79.    Defendants' actions were in violation of the FCRA, 15 U.S.C. §1681o.

80.    As a result of Defendants' aforesaid misconduct, Ms. Garner and the Class have sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses.

### Count III

(Fair Credit Reporting Act, 15 U.S.C. §§1681o, 1681s-2(b)(1)(A):

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting)

81.    Ms. Garner realleges and incorporates the preceding paragraphs.

82.    After being informed by the credit reporting agencies that Ms. Garner disputed the accuracy of the information Defendants had provided to a credit reporting agency, Defendants negligently failed to conduct a proper investigation of their dispute, as required by 15 U.S.C. §1681s-2(b)(A).

83.    Defendants negligently failed to review all relevant information

21

adequately in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

84.    Defendants negligently failed to direct such consumer reporting agencies to delete inaccurate information about Ms. Garner and the class as required by 15 U.S.C. § 1681s-2(b)(C).

85.    Defendants' misconduct was an integral part of Defendants' unlawful scheme at issue.

86.    Ms. Garner has a private right of action to assert claims against Defendants arising under 15 U.S.C. § 1681s-2(b).

87.    Defendants are liable to Ms. Garner and the Class for the actual damages sustained by reason of the aforesaid misconduct, together with her reasonable attorney's fees and expenses, 15 U.S.C. §1681o.

**Count IV**

(Fair Credit Reporting Act, 15 U.S.C. §§1681n, 1681s-2(b)(A) -

Wilful Refusal/Failure to Investigate and/or Rectify Error In Reporting)

88.    Ms. Garner realleges and incorporates the preceding paragraphs.

89.    After being informed by the credit reporting agencies that Ms. Garner disputed the accuracy of the information provided to credit reporting agencies, Defendants willfully failed to conduct a proper investigation of Ms. Garner's dispute about the amount allegedly owed, as required by 15 U.S.C. §1681s-2(b)(A).

22

90.    Defendants willfully failed, neglected and/or refused to review all relevant information purportedly provided by such credit reporting agencies to them in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

91.    Defendants' failure/refused to direct such consumer reporting agencies to delete inaccurate information about Ms. Garner pertaining to their respective accounts as required by 15 U.S.C. §1681s-2(b)(C) was wilful.  This misconduct was an integral part of Defendants' unlawful scheme at issue.

92.    Ms. Garner has a private right of action to assert claims against Defendants arising under 15 U.S.C. § 1681s-2(b).

93.    Defendants are liable to Ms. Garner and the class for the actual damages sustained by reason of their violation of the FCRA, in an amount to be determined  by the trier of fact, together with an award of punitive damages in an amount to  be determined by the trier of fact, as well as reasonable attorney's fees and expenses pursuant to 15 U.S.C. § 1681n.

### Count V

(New York Fair Credit Reporting Act, GBL, Section 380-b -

Willfully Obtaining Consumer  Reports Without A Permissible Purpose)

94.    Ms. Garner realleges and incorporates the preceding paragraphs.

95.    Defendants willfully violated the NYFCRA by obtaining  the consumer reports of Ms. Garner and class members without having a permissible

purpose therefor and/or under false pretenses.

96.    The individual Defendants conducted the business activities (for which MBF Leasing  gave them responsibility) through repeated illegal accesses of consumer reports  and the information contained therein, as described above.  This misconduct was an integral part of Defendants' unlawful scheme at issue.

97.    These illegal acts affected a large number of unwitting consumers and persisted over at least a two year period, evidencing a pattern of Defendants willfully violating the provisions of the NYFCRA.

98.    Defendants' acts in obtaining this information in willful  violation of the NYFCRA without a permissible purpose and/or under false pretenses violate N.Y. Gen. Bus. L., §380-b.

99.    As a result of Defendants' aforesaid misconduct, Ms. Garner and the Class have sustained damages for which Defendants are liable.

### Count VI

(New York Fair Credit Reporting Act, Section 380-b -

Negligently Obtaining Consumer  Reports Without A Permissible Purpose)

100.    Ms. Garner realleges and incorporates the preceding paragraphs.

101.    Defendants violated the NYFCRA by negligently obtaining  the consumer reports of Ms. Garner and class members, without having a  permissible purpose therefor and/or under false pretenses.

102.    The individual Defendants conducted the business activities (for which MBF Leasing gave them responsibility) through repeated illegal accesses of consumer reports  and the information contained therein, as described above.  This

24

misconduct was an integral part of Defendants' unlawful scheme at issue.

103.   These illegal acts affected a large number of unwitting consumers and persisted over at least a two year period, evidencing a pattern of Defendants' negligently violating the provisions of the NYFCRA.

104.   Defendants' actions were in violation of the NYFCRA, Gen. Bus. L., §380-b.

105.   As a result of Defendants' aforesaid misconduct, Ms. Garner and the Class have sustained damages for which Defendants are liable.

### Count VII

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-I -

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting)

106.   Ms. Garner realleges and incorporates the preceding paragraphs.

107.   After being informed by the credit reporting agencies that Ms. Garner disputed the accuracy of the information Defendants had provided to the credit reporting agency, Defendants negligently failed to conduct a proper investigation of their dispute.  This misconduct was an integral part of Defendants' unlawful scheme at issue.

108.   Defendants negligently failed to review all relevant information in conducting their investigation.

109.   Defendants negligently failed to direct such consumer reporting agencies to delete inaccurate information about Ms. Garner.

110.   Ms. Garner has a private right of action to assert claims

25

against Defendants.

111.   Defendants are liable to Ms. Garner and the class for the actual damages sustained by reason of the aforesaid misconduct, together with her reasonable attorney's fees, N.Y. Gen. Bus. L., §380-I.

## Count VIII

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-I -

Wilful Refusal/Failure to Investigate and/or Rectify Error In Reporting)

112.   Ms. Garner realleges and incorporates the preceding paragraphs.

113.   After being informed by the credit reporting agencies that Ms. Garner disputed the accuracy of the information provided to credit reporting agencies, Defendants willfully failed  to conduct a proper investigation of her dispute that she was not liable for the amount appearing on her credit report.

114.   Defendants willfully failed, neglected and/or refused to review all relevant information purportedly provided by such credit reporting agencies to MBF Leasing in conducting its  investigation.

115.   Defendants willfully failed, neglected and/or refused to direct such consumer reporting agencies to delete inaccurate information about Ms. Garner pertaining to her account.

116.   This misconduct was an integral part of Defendants' unlawful scheme at issue.

117.   Ms. Garner has a private right of action to assert claims

26

against Defendants.

118. Defendants are liable to Ms. Garner and the class for the actual damages sustained by reason of their violation of the FCRA, in an amount to be determined by the trier of fact, together with an award of punitive damages in an amount to be determined by the trier of fact, as well as her reasonable attorney's fees, and she may recover therefor pursuant to New York Fair Credit Reporting Act, Gen. Bus. L., §380-I.

**COUNT IX**

(Violation of New York Insurance Law §§ 1102, 2102

119. Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

120. Defendants collected, and continue to collect, $4.95 per equipment per month from each class member towards LDW. Such charge is a premium for obtaining insurance on the leased property. The LDW constitutes insurance under New York Insurance Law. New York Ins. Law § 1101.

121. Defendants are not authorized or licensed to engage in the insurance business in New York or any other state. Defendants' collection of this insurance premium is without a license or authorization as required by New York Insurance Law, N.Y. Ins. Law §§ 1102, 2102.

122. Defendants' collections are thus, illegal, and Ms. Garner and members of the Class have been injured as a result of Defendants' unlawful conduct.

123. Accordingly, Ms. Garner and the Class are entitled to

disgorgement/restitution, damages and/or equitable relief as permitted under state law.

**COUNT X**

(Breach of Contract against MBF)

124.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

125.    By charging and collecting sums in excess of those specified in the first page of the Form Lease, and by imposing undisclosed amounts towards alleged taxes and insurance coverage, MBF breached the contracts at issue.

126.    Further, MBF's concealment of material terms of the contract, and conduct of the fraudulent scheme at issue, was a violation of its implied covenant of good faith and fair dealing.

127.    As a result of such breach, Ms. Garner and the putative Class sustained damages.

128.    Moreover, Defendants' fraudulent motive and tortious conduct was aimed at the public generally.  Their wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.  Defendant MBF is therefore liable to pay punitive damages to Ms. Garner and the Class.  In Pludeman, the Court expressly upheld a claim for punitive damages based on substantially similar conduct.

129.    MBF is therefore liable to pay Ms. Garner and other Class members compensatory damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.  In addition, Ms. Garner and the Class are also entitled to the equitable remedies of

rescission, and injunctive and declaratory relief.

## COUNT XI

(Aiding and Abetting and/or Inducing Breach of Contract

against Individual Defendants)

130.    Ms. Garner repeats and reallege each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

131.    The individual Defendants, i.e., all Defendants except MBF, affirmatively aided and abetted and/or induced Defendant MBF's breach of contract aforesaid.  They masterminded the illegal activities at issue, and orchestrated the misconduct.

132.    Further, they wilfully and knowingly concealed material facts from Ms. Garner and other Class members, and routinely failed to give them a copy of the Form Lease or even reveal the existence of more than the first page of the Form Lease. The individual defendants also knew the material nature of the facts that were  willfully concealed from Class members, and which Defendants ought to have disclosed these facts at that time to the Class members.

133.    By engaging in the conduct described above, Defendants acted wilfully and intentionally.  Moreover, Defendants' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.  Defendants are therefore liable to pay punitive damages to Ms. Garner and the Class.  In Pludeman, the Court expressly upheld a claim for punitive damages based on substantially similar conduct.

134.    Defendants are therefore liable to pay Ms. Garner and other Class

members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate. In addition, Ms. Garner and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

## Count XII

### (Concerted Action)

135.   Ms. Garner reiterates the contents of the paragraphs hereinabove.

136.   Defendants had an agreement or understanding between themselves, whether express or tacit, to participate in a common plan or design to commit the aforesaid tortious acts. Each person acted tortiously, and committed a tort in pursuance of the said agreement or understanding. Accordingly, the actions of each person are attributable to every other person and MBF.

137.   Defendants are therefore liable to pay the class damages in such amount as may be appropriate after discovery and trial.

## Count XIII

### (Civil Conspiracy)

138.   Ms. Garner reiterates the contents of the paragraphs hereinabove.

139.   Defendants conspired with the other(s) to participate in a common plan or design to commit the aforesaid tortious acts. Each of them acted tortiously, and one or more of the said persons committed tort(s) in pursuance of the agreement or understanding. Accordingly, the actions of each person are attributable to every other person and MBF.

140.    Defendants are therefore liable for civil conspiracy to pay the class damages in such amount as may be appropriate after discovery and trial.

## COUNT XIV

### (Money Had and Received)

141.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

142.    By the aforesaid unlawful acts, MBF unlawfully billed and collected money that it was not entitled to.  It received money belonging to Ms. Garner and Class members.  MBF benefitted from the receipt of money, and under principles of equity and good conscience, it should not be permitted to keep the money.

143.    MBF must not be permitted to take advantage of its own wrong and retain, collect, or continue collecting such money.

144.    MBF is liable to pay Ms. Garner and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## COUNT XV

### (Unjust Enrichment)

145.    Ms. Garner repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

146.    By collecting the excessive charges aforesaid, MBF profited at the expense of Ms. Garner and other Class members.  Equity and good conscience require that MBF be ordered to repay these sums to Ms. Garner and other Class members

towards restitution.

147.    MBF must not be permitted to take advantage of its own wrong and retain, collect, or continue collecting these illegal charges hereon.

148.    Moreover, MBF is liable to pay Ms. Garner and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## Count XVI

### (Defamation)

149.    Ms. Garner realleges and incorporates the preceding paragraphs.

150.    Defendants maliciously defamed Ms. Garner and the Class by Defendants' knowing publication to third-parties, including credit reporting agencies, of erroneous information that Ms. Garner owed money to Defendants.

151.    Defendants had, or ought to have had, actual knowledge of the false and fraudulent nature of such information.  Nevertheless, Defendants published it despite having such knowledge.

152.    Defendants' actual knowledge of the falsity and reckless disregard for the  truth demonstrates their malice and/or willful intent to injure Ms. Garner and the class.

153.    As a direct and proximate result of such conduct, Ms. Garner and the Class suffered  actual damages as set forth herein.

154.    Defendants are liable to Ms. Garner and the class for the actual damages sustained by reason of such conduct.

32

155.    Ms. Garner and the Class are entitled to an award of punitive damages from Defendants in  an amount sufficient to punish them for their misconduct as well as to serve as a deterrent  to Defendants and to others to prevent the occurrence of such egregious conduct in the  future.

## JURY TRIAL DEMAND

156.    Ms. Garner and the Class demand a jury trial on all issues so triable.

WHEREFORE, Ms. Garner and class members demand judgment against Defendants, jointly and severally,

a.    Determining that the instant action be maintained as a Class action, on behalf of the Classes as defined above;

b.    Declaring that pages 2-4 of all Form Leases under MBF's standard form Form Lease are unenforceable against Ms. Garner and the Class members;

c.    Ordering Defendants to refund to Ms. Garner and to individual Class members all sums collected in excess of the amount specified in the first page of the Form Lease;

d.    Ordering Defendants to refund to individual Class members all sums collected on account of any judgment obtained by Defendants in a New York court (or in a court other than that of the individual Class members' place of residence), based upon alleged breaches of the Form Lease by such individual Class members, and forthwith enter a satisfaction of all such judgments in the court wherein they were entered;

33

e.  Awarding compensatory, and/or punitive damages to Ms. Garner and Class members in such amount, not less than $100 million, as may be determined after discovery and trial;

f.  Awarding Ms. Garner and Class members the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements; and

g.  for such further and other relief as may be just and proper.

Dated:    New York, New York          **Chittur & Associates, P.C.**
          November 15, 2007

          By:  Krishnan Chittur, Esq. (KC9258)
          286 Madison Avenue Suite 1100
          New York, New York 10017
          Tel: (212) 370-0447
          Email: kchittur@chittur.com

                              And

          Seth R. Lesser, Esq.
          Locks Law Firm
          110 East 55th Street
          New York, New York 10022
          Tel: (212) 838-3333
          Attorneys for Plaintiff and the Class

Of counsel:
H. Rajan Sharma, Esq.

**Exhibit A**

Q445316  MYANW

# EQUIPMENT FINANCE LEASE

## ABOUT YOUR BUSINESS

Lessee (Corporate Business Name) **DECOR SPECIALTIES**    D/B/A

Billing Address **PO BOX 1613**

City **BIG BEAR LAKE**    State **CA**    Zip Code **92315**    Telephone **(909) 866-8545**

Type of Business **Gift Store**    E-Mail Address    **22** Yrs. in Business

Business Address (if different from above) **40716 BIG BEAR BLVD.**

City **BIG BEAR LAKE**    State **CA**    County **SAN BERNARDINO**    Zip Code **92315**    Business Telephone **(909) 866-8545**

Name of Principal **Rhonda    Garner**    Title **Pres.**

Home Address **PO BOX 453**    City **Big Bear Lake** State **CA**    Zip Code **92314**    Telephone **(909) 866-8545**

## EQUIPMENT SUPPLIER

Supplier's Name **UMS**

Address **9012 Research Dr. #200** City **Irvine**    State **CA**    Zip Code **92618**    Telephone **(949) 861-4000**

## EQUIPMENT INFORMATION

Description (Manufacturer, Model, Serial Number)    Quantity

**Lipman    N2085    1001453533**    1

**Veripone    Pinpad1000    021-300-138**    1

Equipment Location

## SCHEDULE OF PAYMENTS

Basic Monthly Lease Payment    $ **69.99**

Minimum Lease Term    **48** Months

Plus Applicable Taxes

## PAYABLE AT SIGNING OF THE LEASE

☐ First & Last Monthly Payment    $

☑ Last Monthly Payment    $ **69.99**

Plus Applicable Taxes

## ABOUT YOUR BANK

Bank Name **FIRST MOUNTAIN BANK**    Routing **122238721**    Account # **001-005944**

Lessee hereby authorizes MBF Leasing LLC, or its designee successor or assign (hereinafter "Lessor") to withdraw any amounts including any and all sales and property taxes now due or hereinafter imposed owed by Lessee under this Equipment Finance Lease ("Lease") by initiating debit entries to Lessee's account at the financial institution (hereinafter "Bank") indicated above or at such other Bank as Lessee may from time to time use. In the event of default hereunder, Lessee authorizes debit of Lessee's account or credit card for the full amount due under this Lease as well as any other fees Lessor may incur and to charge any debit entries initiated by Lessor to Lessee's account. In the event that Lessor withdraws erroneously from Lessee's account, Lessee authorizes Lessor to credit Lessee's account for the amount erroneously withdrawn. Lessee understands that the foregoing ACH authorization is a fundamental condition to induce Lessor to accept this Lease. Consequently, such authorization is intended to be irrevocable. In the event that Lessee terminates such ACH authorization, Lessor, in its sole discretion, may either deem such termination to be an event of default in accordance with paragraph 11 hereof or may revise Lessee for payments due under this Lease and include a $5.00 per month processing fee in such invoices.
THE TERMS OF THIS LEASE REPRESENT THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN LESSOR AND LESSEE AND MAY NOT BE WAIVED ALTERED MODIFIED REVOKED OR RESCINDED AND ALL PRIOR AND/OR CONTEMPORANEOUS ORAL AND WRITTEN REPRESENTATIONS ARE MERGED HEREIN. ANY AGREEMENTS TO MODIFY THIS LEASE MUST BE BY A SIGNED WRITING EXECUTED BY LESSOR AND LESSEE AND NO ATTEMPT AT ORAL MODIFICATION OR RESCISION OF THIS LEASE OR ANY TERM HEREOF WILL BE BINDING. BY INITIALING THIS PROVISION LESSEE AGREES TO BE BOUND BY THE TERMS OF THIS LEASE AND TO THE EXTENT APPLICABLE THE PROVISIONS CONCERNING A SEPARATELY SIGNED DOCUMENT PURSUANT TO §34-305 OF THE UNIFORM COMMERCIAL CODE HAS BEEN COMPLIED WITH. LESSEE EXPRESSLY WAIVES ALL OF ITS RIGHTS AND REMEDIES SET FORTH IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE, INCLUDING WITHOUT LIMITATION LESSEE'S RIGHTS, IF ANY, TO REPUDIATE, REJECT, REVOKE ACCEPTANCE, CLAIM A SECURITY INTEREST IN THE EQUIPMENT, OFFSET AND COVER. THIS LEASE AND ANY AND ALL MODIFICATIONS AND AGREEMENTS BETWEEN LESSOR AND LESSEE SHALL ONLY BE EFFECTIVE UPON EXECUTION BY AN OFFICER OF LESSOR.    X _____ LESSEE INITIALS

## LEASE ACCEPTANCE

Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease. THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM INDICATED HEREIN. INVESTIGATIVE CREDIT REPORT: Applicant authorizes MBF Leasing LLC, its assigns or its agents to obtain an investigative credit report from a credit bureau or a credit agency and to investigate the references given on any other statement or data obtained from Lessee.

Lessee's Signature/Title _(signed)_ **Pres.**    Print Name **Rhonda Garner**    Date **1/5/05**

## PERSONAL GUARANTY

To induce Lessor to make this Lease and purchase the Equipment for Lease knowing that Lessor is relying on this Guaranty as a precondition to making this Lease. I INDIVIDUALLY, PERSONALLY, ABSOLUTELY AND UNCONDITIONALLY GUARANTY to Lessor (and any person or firm Lessor may transfer its interests to) all payments and other obligations owed by Lessee to Lessor under this Lease and any add-on lease. Equipment Schedules and future leases between Lessee and Lessee, including, but not limited to, Lessor's fees and legal costs incurred in enforcing this Lease. I will also pay all reasonable costs and fees incurred by Lessor in enforcing this Guaranty. I waive notice of default and I agree that Lessor may proceed directly against me without first proceeding against Lessee or the security including the Equipment. This Guaranty shall be governed by the laws of New York. I FREELY CONSENT TO PERSONAL JURISDICTION IN THE NEW YORK COURTS INCLUDING WITHOUT LIMITATIONS THE CIVIL COURT OF THE CITY OF NEW YORK AND I WAIVE TRIAL BY JURY. This Guaranty will bind my heirs representatives and successors.

Personal Guarantor's Signature _(signed)_    , An Individual    Date **1/5/05**

Print Name **Rhonda    Garner**    Home Telephone **(709) 866-8545**

Home Address **40716 BIG BEAR BLVD.**    City **BIG BEAR LAKE** State **CA**    Zip Code **92315**

Social Security # **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**

Credit Reference For Guarantor ☐ VISA ☐ MasterCard    Account Number    Expiration Date

## ACCEPTANCE BY MBF LEASING LLC

## 1. LEASE TERM; RENTAL

Neither Leasing Systems, Inc. nor its dealers or assigns (collectively "Lessor") hereby leases to Lessee and Lessee hereby leases from Lessor the equipment described above together with any computer software including (1) manuals, updates, revisions, program and data files, and documentation relating thereto ... , on terms and conditions set forth herein. From all replacement parts, repairs, additions, substitutions and accessories incorporated therein and/or affixed thereto, referred to as the "Equipment"; on terms and conditions set forth herein. From time to time the Lessor and Lessee may execute one or more equipment schedules ("Equipment Schedules"). Each such Equipment Schedule relating to one or more items of Equipment shall be deemed a separate Lease incorporating all of the terms and provisions of this Lease. In the event of a conflict between the terms of this Lease and the terms and conditions of an Equipment Schedule, the terms and conditions of the Equipment Schedule shall govern and control that Equipment Schedule. This Lease shall commence the "Commencement Date") on the date that the Equipment is accepted by Lessee the "Acceptance Date") and continue thereafter until terminated as provided for herein. The Acceptance Date shall be the date specified in receipt of the Equipment and, if applicable, the date the Software is transmitted to Lessee. If the Acceptance Date is other than the first day of a calendar month, then the Commencement Date of this Lease shall be the first day of the calendar month following the month which includes the Acceptance Date, and Lessee shall pay to Lessor, in addition to all other sums due hereunder, an amount equal to one-thirtieth of the amount of the average monthly rental payment due or to become due hereunder multiplied by the number of days from and including the Acceptance Date to the Commencement Date so the Lease, unless otherwise provided herein, the monthly payments shall be payable on the first day of each month after the Commencement Date. The amount stated above, until the first and all other obligations of Lessee shall have been satisfied and paid in full. All monthly lease payments shall be made to Lessor by Automatic Clearing House ("ACH") transfer from Lessee's designated account as provided above. In the event Lessee has used the first and last monthly lease payments without applicable taxes pursuant to Paragraph 7 hereof. Lessor may add such taxes to the first or a subsequent ACH transfer from Lessee's designated account as provided above. Lessee acknowledges that no interest will be paid on any advance lease payments.

## 2. SOFTWARE

Lessee's right to use the Software is being acquired pursuant to a sub-license from Vendor to Lessee of a software license agreement between Vendor and the Licensor (collectively the "License"). Lessee reaffirms all of its rights and obligations under the License. Lessor is not a party to the License, but is an express third-party beneficiary thereof. Lessee assigns to Lessor all of its rights and benefits but Lessee retains all of the obligations and customs under the License. Lessor sub-leases back to Lessee, expiring upon the termination or expiration of this Lease or upon an event of Default.

## 3. PURCHASE AND ACCEPTANCE; NO CANCELLATION; NO WARRANTIES

Lessee requests Lessor to purchase the Equipment from Equipment Supplier or vendor ("Vendor") and arrange for delivery to Lessee and, Lessee shall pay all assessed costs for delivery and installation of Equipment. Lessor also has no responsibility for delay or failure of Vendor to fill the order for the Equipment. LESSOR DID NOT SELECT MANUFACTURE, LICENSE, SUPPLY OR INSPECT THE EQUIPMENT AND HAS NO EXPERTISE REGARDING THE EQUIPMENT. LESSEE HAS SELECTED VENDOR AND THE EQUIPMENT BASED ON LESSEE'S OWN JUDGMENT. LESSOR IS BUYING THE EQUIPMENT AT LESSEE'S REQUEST ONLY FOR THE PURPOSE OF LEASING IT TO LESSEE. Before signing this Lease, Lessee approved the supply contract (if any) between Lessor and Vendor and the License. (1 any). Lessee has been advised in writing as it now contact of this Lease, that Lessee may have rights against Vendor under the supply contract (if any) or the License. Lessor agrees that Lessee may contact Vendor or Licensor to find out what these rights against Vendor or Licensor are, (if any). THIS LEASE CANNOT BE CANCELLED BY LESSEE AT ANY TIME FOR ANY REASON. LESSEE'S DUTY TO MAKE THE MONTHLY LEASE PAYMENTS HEREUNDER IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE, LOSS OR ANY OTHER SETOFF, DEFENSE, COUNTERCLAIM OR OTHER CLAIM AGAINST THE VENDOR OR LICENSOR OR ANY OTHER PROBLEM INCLUDING THE REVOCATION OR TERMINATION OF THE LICENSE (IF ANY) OR OF ANY MAINTENANCE, SUPPORT OR OTHER SERVICES TO BE PROVIDED. LESSEE AGREES THAT LESSOR HAS NOT MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE. DIRECTLY OR INDIRECTLY EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING THE SUITABILITY OF SUCH EQUIPMENT, ITS DURABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, ITS MERCHANTABILITY, ITS CONDITION, AND/OR ITS QUALITY. AS BETWEEN LESSEE AND LESSOR OR LESSOR'S ASSIGNS, LESSEE LEASES THE EQUIPMENT "AS IS". LESSOR AND LESSOR'S ASSIGNS SHALL NOT BE LIABLE TO LESSEE FOR ANY LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE CAUSED DIRECTLY OR INDIRECTLY INCLUDING CLAIMS OR GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR FOR ANTICIPATORY PROFITS BY ANY EQUIPMENT LEASED HEREUNDER OR THE USE OF MAINTENANCE THEREOF OR THE FAILURE OF OPERATION THEREOF, OR REPAIRS, SERVICE OR ADJUSTMENT THERETO, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY THEREOF, OR BY ANY INTERRUPTION OF SERVICE OR LOSS OF USE THEREOF, OR THE USE THEREOF IN VIOLATION OF THE RIGHTS OF ANY PARTY WHOMSOEVER, OR FOR ANY LOSS OF BUSINESS OR DAMAGE WHATSOEVER AND HOWSOEVER CAUSED. NO REPRESENTATION OR WARRANTY AS TO THE EQUIPMENT OF ANY OTHER MATTER BY VENDOR SHALL BE BINDING ON LESSOR OR LESSOR'S ASSIGNS, NOR SHALL THE BREACH OF SUCH RELIEVE LESSEE OR, IN ANY WAY AFFECT, ANY OF LESSEE'S OBLIGATIONS TO LESSOR OR LESSOR'S ASSIGNS. AS SET FORTH HEREIN LESSOR AND LESSOR'S ASSIGNS DISCLAIM AND SHALL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE OR INJURY TO PERSONS OR PROPERTY CAUSED BY THE EQUIPMENT WHETHER ARISING THROUGH THE NEGLIGENCE OF THE LESSEE OR IMPOSED BY LAW. LESSOR MAKES NO, AND SPECIFICALLY EXCLUDES ANY REPRESENTATION OR WARRANTY RELATING TO ANY SOFTWARE, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF TITLE, VALIDITY OR ENFORCEABILITY OF LICENSE, NON-INFRINGEMENT, AVAILABILITY OR QUALITY OF VENDOR OR LICENSOR SUPPORT, OR FITNESS FOR ANY PARTICULAR PURPOSE.

The Equipment is and properly installed, does not operate as represented or warrantied by Vendor or a sub-Licensor for any reason, Lessee shall move any claim or account thereof solely against Vendor or Licensor and hereby waives and releases any and all rights to now or hereafter assert any claim against Lessor concerning the Equipment and shall nonetheless pay Lessor all rent payable under this Lease. Lessor agrees to assign to Lessee, solely for the purpose of making and prosecuting any such claims, any rights it may have against Vendor or Licensor for breach of warranty or representations respecting the Equipment.

Notwithstanding any lease that may be paid to Vendor or any agent of Vendor, Lessee understands and agrees that neither Vendor nor any agent of Vendor is an agent of Lessor and that neither Vendor nor his agent is authorized to waive or alter any term or condition of this Lease.

## 4. LESSOR TERMINATION BEFORE EQUIPMENT ACCEPTANCE

If, within sixty (60) days from the date Lessor orders the Equipment, same has not been delivered, installed and accepted by Lessee in form satisfactory to Lessor, Lessor may on ten (10) days written notice to Lessee, terminate this Lease and its obligation to Lessee.

## 5. TITLE

Lessor shall at all times retain title to the Equipment unless otherwise agreed to in writing. All documents of title and evidences of delivery shall be delivered to Lessor. Lessor shall not change or remove any insignia or lettering which is on the Equipment at the time of delivery thereof, or which is thereafter placed thereon, indicating Lessor's ownership thereof. At any time during the term of the Lease, upon request of Lessor, Lessee shall affix to the Equipment in a prominent place, labels, plates or other markings supplied by Lessor stating that the Equipment is owned by Lessor. Lessor is hereby authorized by Lessee, at Lessee's expense, to cause this Lease, or any statement or other instrument in respect of this Lease showing the interest of Lessor in the Equipment, including Uniform Commercial Code Financing Statements, to be filed or recorded and refiled and re-recorded. Lessee agrees to execute and deliver any statement or instrument requested by Lessor for such purpose, and agrees to pay or reimburse Lessor for any filing, recording or stamp fees or taxes arising from the filing or recording of any such instrument or statement. Lessee shall, at its expense, protect and defend Lessor's title at all times keeping the Equipment free from all liens and claims whatsoever except for those created by or in favor of Lessor, its successor and/or assigns, and shall give Lessor immediate written notice thereof and shall indemnify Lessor from any loss caused thereby. Lessee shall execute and deliver to Lessor, upon Lessor's request, such further instruments and assurances as Lessor deems necessary or advisable for the confirmation or perfection of Lessor's rights hereunder. Lessee authorizes Lessor to file any such instrument, including, but not limited to, any Uniform Commercial Code Financing Statement(s), without Lessee's signature and, if the signature of Lessee is required thereon, Lessee irrevocably appoints Lessor as Lessee's attorney-in-fact to execute and file any such statement or other instrument in the name and on behalf of Lessee. It is the intention of the parties that the transaction(s) contemplated herein shall constitute an equipment finance lease and not a security interest of collateral assignment of the Equipment by Lessor. Notwithstanding the intention of the parties, if any court of competent jurisdiction shall hold that the transaction(s) contemplated herein constitute a security interest or collateral assignment and not an equipment finance lease of the Equipment by Lessor, then Lessor has a first lien security interest in the Equipment (including without limitation, the Software and general intangibles, licenses and intellectual Property rights with respect thereto, and all substitutions, modifications, replacements, additions, accessions, proceeds, and products of, to or for any of the foregoing) as of the date hereof to secure the obligations of Lessee, its successors and assigns, hereunder and Lessor shall have all rights and remedies of a secured party under the Uniform Commercial Code as adopted in any applicable jurisdiction. Notwithstanding anything contained herein to the contrary, the Software is subject to the exclusive proprietary rights of the Vendor or Licensor and Lessee shall have no ownership rights in the Software. Lessee shall have no right, title or interest in the Software except as set forth in the License and as specifically provided here.

## 6. CARE AND USE OF EQUIPMENT

Lessee shall maintain the Equipment in good operating condition, repair and appearance, and protect the same from deterioration, other than normal wear and tear, shall use the Equipment in the regular course of business only within its normal capacity, without abuse and in a manner contemplated by Vendor, and in accordance with the License, shall comply with laws, ordinances, regulations, requirements and rules with respect to the use, maintenance and operation of the Equipment, shall not make any modification, alteration, or addition to the Equipment (other than normal operating accessories or controls or later or production versions and maintenance or enhancement releases related to and permitted under the License which shall when added to the Equipment, become the property of Lessor) without the prior written consent of Lessor, which shall not be unreasonably withheld, shall not so affix the Equipment to realty as to change its nature to real property or fixture, and agrees that the Equipment shall remain personal property at all times regardless of how attached or installed; shall keep and maintain the Equipment at the location shown above, and shall not remove the Equipment without the consent of Lessor, which shall not be unreasonably withheld. Lessee represents that the Equipment is being leased for business and/or professional purposes and agrees that under no circumstances shall the Lease be construed as a consumer contract. Lessor shall have the right during normal hours, upon reasonable prior notice to Lessee and subject to applicable laws and regulations, to enter upon the premises where the Equipment is located in order to inspect, observe or remove the Equipment, or otherwise protect Lessor's interest.

**7.  NET LEASE; TAXES.**

Lessee intends the monthly lease payments hereunder to be net to Lessor and Lessee shall pay all taxes, use, excise, personal property, stamp, documentary, and other levies, fees, assessments, and charges imposed on the ownership, possession or use of the Equipment during the term of this Lease. Lessor will add such taxes, fees and other charges to the monthly payments hereunder including handling and administration costs. To the extent that such taxes, fees and other charges are not imposed in equal monthly payments, Lessor may estimate the amount thereof and include a proportional amount with each monthly payment hereunder. Lessee agrees to pay such monthly amount as additional monthly rent during the term of this lease and any provisions thereof. Upon Lessor's request, Lessee shall file all necessary returns and reports relating to such taxes, fees and charges. Lessee's obligations under this paragraph 7 shall survive the termination of this Lease.

**8.  INDEMNITY.**

Lessee shall and does hereby agree to indemnify and save Lessor, its agents, servants, successors and assigns harmless against and from any liability, damages, or loss, including reasonable counsel fees arising out of the ownership, selection, manufacture, possession, leasing, renting, operation, regardless of where, how and by whom operated, control, use, condition including but not limited to latent and other defects whether or not discoverable by Lessee, the manufacture, delivery, rejection, or de very and return or other disposition of the Equipment, and including but not limited to trademark, tort, anticipatory or consequential damages. The indemnities and obligations herein provided shall continue in full force and effect notwithstanding termination of this Lease.

**9.  RISK OF LOSS.**

Lessee hereby assumes the entire risk of loss, damage or destruction of the Equipment from any and every cause whatsoever during the term of this Lease and thereafter until returned to Lessor. No such loss or damage shall impair any obligation of the Lessee under this Lease which shall continue in full force and effect. In the event of loss, damage or destruction of any item of Equipment, Lessee shall promptly notify Lessor and shall at its expense (except to the extent of any proceeds of insurance provided by Lessee which shall have been received by Lessor at a risk) (a) place damage or destruction, and at Lessor's option or at either its repair such item, returning it to its previous condition, unless damaged beyond repair; or (b) pay Lessee a mount and unpaid monthly lease and other payments, late charges and interest, plus an amount (the "Loss Amount") equal to (i) the net present value of all rental payments to become due during the remaining term of the Lease, discounted at a rate of six percent (6%) per annum plus (ii) the amount of any purchase option or obligation with respect to the Equipment, or, if there is no such option or obligation, the fair market value of the Equipment as estimated by Lessor in its sole reasonable discretion, or (c) replace such item with a like item acceptable to Lessor, in good condition and of equivalent value, which shall become property of Lessor, included within the term "Equipment" as used herein, and leased from Lessor herewith for the balance of the full term of this Lease.

**10.  INSURANCE.**

Lessee shall keep the Equipment insured against all risks of loss or damage from every cause whatsoever, in amounts determined by Lessor provided that in no event shall such insurance be less than the loss amount set forth in Section 9(b) herein above. The amount of such insurance shall be sufficient so that neither Lessor nor Lessee will be considered a co-insurer. Lessee shall also carry public liability insurance, personal injury and property damage, covering the Equipment. All such insurance shall provide that losses, if any, shall be payable to Lessor, and all such losses by insurance shall include Lessor as named insured and require that the insurer give Lessor at least ten (10) days written notice prior to the effective date of any modification or cancellation thereof. All such policies shall provide that such insurance shall not be cancelled or modified, as against Lessor due to any act or neglect on the part of Lessee or of any other party. Lessee shall pay the premiums for such insurance and deliver to Lessor satisfactory evidence of the insurance coverage required hereunder on or before the Commencement Date. As requested by Lessor. The proceeds of such insurance, payable as a result of loss or damage to any item of the Equipment, shall be applied: (a) solely Lessee's obligations as set forth in Paragraph 9 above. Lessee hereby irrevocably appoints Lessor as Lessee's attorney in fact to make claim for, receive payment of and execute and endorse all documents, checks or drafts received in payment for loss or damage under any such insurance policy. In the event Lessee does not provide such evidence of insurance coverage, Lessee is deemed to have chosen to buy the Loss and Destruction waiver at the price in effect, which Lessor reserves the right to change from time-to-time. Under the Loss and Destruction waiver Lessor will waive Lessee's responsibility for loss or destruction of the Equipment and for keeping the Equipment fully insured during the term of this Lease. Such waiver will provide that Lessee will be responsible for the first $250 with respect to each claim per piece of equipment. After the loss or destruction of the Equipment, Lessor will provide for its replacement with equipment of comparable value at that time to the extent that Lessee took reasonable care in preventing the loss or destruction of the Equipment.

**11.  DEFAULT.**

If any one of the following events (each, an "Event of Default") shall occur, then, to the extent permitted by applicable law, Lessor shall have the right to exercise any one or more of the remedies set forth in Paragraph 12 below: (a) Lessee fails to pay any monthly lease or any other payment hereunder when due, and such failure continues for five (5) days or (b) Lessee or any guarantor becomes insolvent or makes an assignment for the benefit of creditors, or (c) a receiver, trustee, conservator or custodian of Lessee or any guarantor or all or a substantial part of the assets of Lessee or any guarantor is appointed with or without the consent of Lessee or such guarantor, or (d) a petition is filed by or against Lessee or any guarantor under the Bankruptcy Code or any amendment thereto, or under any other insolvency law providing for the relief of debtors, or (e) Lessee admits, in writing, of its inability to pay its debts, or (f) any of Lessee's property is attached, or (g) any action is taken to dissolve or liquidate Lessee or any of its shareholders, partners or members or (h) Lessee fails to pay when due any obligation to Lessor arising independently of this Lease and such failure continues for five (5) days or (i) Lessee breaches any other covenant, warranty or agreement hereunder, and such breach continues for ten (10) days after the earlier of (i) the date on which Lessee obtains, or should have obtained, knowledge of such breach, or (ii) the date on which notice thereof shall be given by Lessor to Lessee, or (j) Lessee conveys, sells, transfers or assigns substantially all of Lessee's assets or ceases doing business as a going concern or (k) Lessee breaches any term or condition of any License governing the right to use the Software.

**12.  REMEDIES.**

If an Event of Default shall occur as described in Paragraph 11 hereinabove, Lessor may, at its option, at any time and without notice (a) declare immediately due and payable and recover from Lessee, as liquidated damages for the loss of a bargain and not as a penalty, an amount equal to all accrued and unpaid monthly lease payments, late charges, collection costs, and interest, plus the Loss Amount as set forth in Section 9(b) hereinabove; (b) without demand or legal process enter into the premises where the Equipment may be found and take possession of and remove the Equipment or render it unusable without removal, without liability for such entering, Lessee, shall, upon demand of Lessor, assemble the Equipment and deliver it as directed by Lessor; Lessor waives any right to recover the Equipment and for any loss of use after an Event of Default has occurred. With respect to any Software, Lessee shall cease to use such Software and will assemble and deliver to Lessor the same in electronic or other form. Lessee shall remit to Lessor upon demand any amounts due and payable with respect to the licensing of the Software or the assignment hereof. Lessor may terminate any sub-license from Lessor to Lessee and may request the Vendor and/or the Licensor to terminate any licenses with the Lessee and all maintenance support or other services under the License. Lessee agrees that nonmonetary damages are not a sufficient remedy and will not adequately compensate Lessor for Lessee's breach and that Lessor shall be entitled to seek specific performance or other injunctive or equitable relief. Lessor may hold, sell or otherwise dispose of any such Equipment at a private or public sale. In the event Lessor exercises its right to repossess the Equipment as set forth hereinabove Paragraph 12(b), Lessor shall give Lessee credit for any sums received by Lessor from the sale or rental of the Equipment after deduction of the expenses of sale or rental. Lessee shall pay all of Lessor's recovery costs after a default, including: (i) attorney's fees equal to twenty-five percent (25%) of the amount of Lessor's claim or $1,500, whichever is greater; (ii) reasonable attorney's fees for obtaining an order, writ or similar process to recover possession of the Equipment; (iii) costs of suit; (iv) $250.00 to cover Lessor's internal collection overhead; (v) $225.00 to cover Lessor's internal repossession and remarketing overhead if an internal repossession is made or attempted; and (vi) all other reasonable out-of-pocket costs. Lessor and Lessee acknowledge the difficulty in establishing a value for the unexpired lease term and owing to such difficulty agree that the provisions of this paragraph represent an agreed measure of damages and are not to be deemed a forfeiture or penalty. In the event Lessee has provided a security deposit to Lessor, Lessor shall have the right to apply the security deposit to reduce the amount Lessee owes pursuant to this paragraph. In the event Lessee pays all obligations under this Lease and returns the Equipment to Lessor in accordance with paragraph 6, Lessor will return any security deposit to Lessee. No interest will be paid on the security deposit. All remedies of Lessor hereunder are cumulative, are in addition to any other remedies provided for by law, and may, to the extent permitted by law, be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy. No failure on the part of Lessor to exercise and no delay in exercising any right or remedy shall operate as a waiver thereof or modify the terms of this Lease.

**3.  LATE PAYMENTS AND COLLECTION COSTS.**

Whenever any monthly lease payment is not made by Lessee in full when due hereunder, Lessee agrees to pay to Lessor, as a late fee, an amount equal to fifteen percent (15%) of the full scheduled payment, but not less than five dollars ($5.00) and only to the extent allowed by law. Such amount shall be payable in addition to all amounts payable by Lessee as a result of exercise of any of the remedies herein provided. In addition, Lessee will pay all out-of-pocket costs relating to or resulting from the collection of the late payment including a processing charge of $20.00 for each returned check, rejected ACH charge or returned credit card charge; and all reasonable collection costs incurred by Lessor. Payments shall be applied to late fees and to processing charges first and then to Lessee obligations until all funds have been exhausted.

**4.  ASSIGNMENT; NOTICE OF INTENDED ASSIGNMENT.**

Lessor may, without notice to and without Lessee's consent, assign or transfer this Lease or any Equipment, rent or other sums due or to become due hereunder, and in such event Lessor's assignee or transferee shall have the rights, powers, privileges and remedies of Lessor hereunder. Lessee hereby acknowledges notice of Lessor's intended assignment of Lessor's interest in this Lease and upon such assignment, Lessee agrees not to assert, as against Lessor's assignee, any defense, set off, recoupment, claim or counterclaim, that it may have against Lessor whether arising under this Lease transaction or otherwise. LESSEE SHALL NOT ASSIGN THIS LEASE, THE LICENSE OR THE EQUIPMENT OR ANY INTEREST HEREUNDER AND SHALL NOT ENTER INTO ANY SUBLEASE WITH RESPECT TO THE EQUIPMENT OR THE LICENSE COVERED HEREBY WITHOUT LESSOR'S PRIOR WRITTEN CONSENT AND IF LESSOR SHALL PERMIT ANY SUCH ASSIGNMENT BY LESSEE, THE ASSIGNEE SHALL, AS A CONDITION TO LESSOR'S GRANTING OF CONSENT TO SUCH ASSIGNMENT, ASSUME LESSEE'S OBLIGATIONS HEREUNDER IN WRITING, IN FORM AND SUBSTANCE SATISFACTORY TO LESSOR. BUT NO SUCH ASSIGNMENT SHALL RELEASE LESSEE FROM ANY OF LESSEE'S OBLIGATIONS HEREUNDER.

on expiration of the lease term and provided no Event of Default shall have occurred and be continuing, Lessee shall have the option to purchase all of the Lessor's rights, title and interest in the Software, if any) for its then fair market value, calculated as a ... is, not less than at of the Equipment ... in accordance with the following: if the term of this Lease is forty-eight (48) months or more, the buyout option as a ... centage of the aggregate monthly lease payments in accordance with the following: If the term of this Lease is thirty-six (36) to forty-seven (47) months, the buyout option as a percentage of ... centage of the aggregate lease payments shall be ten percent (10%). If the term of this Lease is twenty-six (36) to thirty-five (35) months, the buyout option as a percentage of the aggregate lease payments shall be fifteen percent (15%). If the term of this Lease is twenty-four (24) to thirty-five (35) months, the buyout option as a percentage of ... e aggregate lease payments shall be twenty percent (20%). If the term of this Lease is twelve (12) to twenty-three (23) months, the buyout option as a percentage of the ... gregate lease payments shall be twenty-five percent (25%). The exercise of this option must be communicated to Lessor in writing at least thirty (30) days prior to the ... piration of the lease term. Purchase option payment will be due at lease expiration.

**. RETURN OF PROPERTY.**

... ssee will notify Lessor in writing, at least 30 days prior to the Lease expiration, of Lessee's intention to return the Equipment. Within 10 days following the expiration of the ... ese, Lessee shall deliver, freight prepaid, the Equipment to Lessor, at its address set forth above, complete and in good order and working condition, reasonable wear and ... ar alone excepted. Lessee shall assemble and deliver to Lessor all Software in electronic or other form as directed by Lessor. If any Software requires re-licensing, Lessee ... all bear all costs related thereto and shall execute such documents as may be required. Lessee shall also pay to Lessor such sum as may be necessary to cover replacement ... r all damaged, broken or missing parts of the Equipment. If, upon such expiration or termination, Lessee does not return the Equipment to Lessor within ten (10) days after ... e expiration or termination of the term of the Lease, the Equipment shall continue to be held and leased hereunder and this Lease shall thereupon be extended on a month- ... -month basis at the same monthly rental and upon the same terms and conditions set forth herein, subject to the right of either Lessee or Lessor to terminate the Lease ... on one month's written notice, whereupon Lessee shall forthwith deliver the Equipment to Lessor as set forth in this Paragraph. If Lessee paid the last monthly lease payment ... the time of the execution of this Lease, such payment shall be applied (without interest) to the last monthly lease payment upon the return by Lessee of the Equipment ... ovided that no other sums are owing by Lessee to Lessor hereunder, in which event Lessor may apply such payment to any amount outstanding hereunder.

**'. EFFECTIVE DATE.**

... is Lease shall become valid when executed and accepted by Lessor, notice of Lessor's acceptance of this Lease being hereby waived by Lessee.

**. GOVERNING LAW.**

... IS LEASE AND ANY GUARANTY HEREOF SHALL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE INTERNAL LAWS OF THE STATE AND CITY OF NEW YORK.

**. CHOICE OF FORUM FOR RESOLUTION OF DISPUTES.**

... S USED IN THIS PARAGRAPH 19, "APPLICABLE JURISDICTION" MEANS THE COUNTY OF NEW YORK, STATE OF NEW YORK AND CITY OF NEW YORK, OR SUCH OTHER COUNTY STATE OR CITY, ... S THE SAME MAY CHANGE FROM TIME TO TIME, WHERE THE HOLDER OF LESSOR'S INTEREST IN THIS LEASE MAINTAINS ITS PRINCIPAL OFFICE RESPONSIBLE FOR ADMINISTRATING THIS ... ASE. ALL ACTIONS, PROCEEDINGS OR LITIGATION BROUGHT BY LESSOR OR LESSEE OR ANY GUARANTOR SHALL BE INSTITUTED AND PROSECUTED IN THE APPLICABLE JURISDICTION. THE ... RTIES ACKNOWLEDGE THEIR AGREEMENT THAT THE STATE COURTS SITTING IN THE APPLICABLE JURISDICTION SHALL BE THE EXCLUSIVE FORUM FOR ALL ACTIONS, PROCEEDINGS OR ... TIGATION BETWEEN OR AMONG THE PARTIES, NOTWITHSTANDING THAT OTHER COURTS MAY HAVE JURISDICTION OVER THE PARTIES AND THE SUBJECT MATTER; PROVIDED, HOWEVER, THAT ... Y ACTION OR PROCEEDING BY LESSOR TO RECOVER POSSESSION OF THE EQUIPMENT (WHETHER DENOMINATED AS A REPLEVIN, SEQUESTRATION CLAIM AND DELIVERY OR OTHERWISE) ... AY BE BROUGHT IN ANY COUNTY WHERE THE EQUIPMENT MAY BE FOUND. LESSEE AND GUARANTOR AGREE THAT ANY SUMMONS AND/OR COMPLAINT OR OTHER PROCESS TO COMMENCE ... Y LITIGATION BY LESSOR WILL BE PROPERLY SERVED IF MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, WITH DELIVERY TO EITHER GUARANTOR, LESSEE OR LESSEE'S ... EGISTERED AGENT.

**. WAIVER OF JURY TRIAL.**

... SSEE AND ANY GUARANTOR WAIVE, INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION BETWEEN OR AMONG LESSOR, LESSEE OR ANY ... UARANTOR.

**. SUBORDINATION.**

... l indebtedness, now existing or hereafter arising, between Lessee and any guarantor is hereby subordinated to all present and future obligations of Lessee or any guarantor to Lessor, including, ... t not limited to, the Lease obligations, and, after the occurrence of an Event of Default, no payment shall be made or accepted on any such indebtedness due Lessee or any guarantor until all ... ch obligations to Lessor are paid and satisfied in full.

**2. SURVIVAL OF GUARANTY OBLIGATIONS.**

... l obligations of any guarantor shall remain enforceable notwithstanding that this Lease, or any obligations performed hereunder, may be void or voidable as against Lessee or any Lessee's ... editors, including, but not limited to, a trustee in bankruptcy, by reason of any fact or circumstance.

**3. MISCELLANEOUS.**

... is Lease contains the entire agreement between the parties and may not be altered, amended, modified, terminated or otherwise changed including by prior, contemporaneous or subsequent ... al agreements, except in writing signed by an executive officer of Lessor. Lessee and Lessee certifies that no such oral agreements exist. Lessor and Lessee intend this to be a valid and subsisting legal ... ocument, and agree that no provision of this Lease which may be deemed unenforceable shall in any way invalidate any other provision or provisions of this Lease, all of which shall remain in full ... rce and effect. The undersigned certifies that he/she is authorized to execute this Lease on behalf of Lessee. Any notice intended to be served hereunder shall be deemed sufficiently sent if sent ... y regular mail, postage prepaid, addressed to the party at the addresses contained herein. This Lease shall be binding upon the parties, their successors, legal representatives and assigns. All ... ptions are intended to be descriptive only and shall not govern the Lease provisions.

**4. WAIVER; SEVERABILITY.**

... o delay by Lessor in enforcing any rights under this Lease shall be interpreted as a waiver of said rights. If any provision of this Lease or the application thereof to any person, business entity, or ... ircumstance is determined to be invalid, the remainder of this Lease, or the application of such provisions to any person, business entity or circumstances other than those to which it is held ... valid, shall not be affected thereby.

---

**DEALER'S BILL OF SALE:**

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns, transfers and sets over the Equipment to MBF Leasing LLC. The undersigned represents and warrants to Lessor that the undersigned is the absolute owner of the Equipment, that the Equipment is free and clear of all liens, charges and encumbrances, and that the undersigned has full right, power and authority to make this bill of sale.

Seller: UMS      Dated: 1/05/05

By: maly

Title: manager